HERSCHEL C. ADAIR, Appellant, v. KANSAS CITY TERMINAL RAILWAY COMPANY; H. P. O'HA-GAN et al., Partners, and O'HAGAN & LAKE, a Corporation.

### Division One, April 10, 1920.

1. **MASTER AND SERVANT: Railway Company and Employee of Its Contractor: Excavation: Personal Injuries.** Where partners had a contract with a railway company to construct a steam tunnel connecting its power house with its union station, and employed plaintiff as labor-foreman in the work of excavation and pouring concrete, and the railway company had inspectors present for the purpose of seeing that the contract was properly performed by the use of competent laborers, who at times gave directions to that end, and plaintiff was required to conform to their instructions, but they did nothing by such interference which tended in any wise to bring about plaintiff's injury, caused by a defective construction of the wooden walls to hold the concrete until it hardened, there was no relation of master and servant between plaintiff and the railroad company, and it is not liable to him for his injuries due to a failure to supply him with safe appliances and a safe place in which to work.

2. ———: ———: **Estoppel by Pleading Assumption of Risks: Inconsistencies: Waiver.** The statute (Sec. 1807, R. S. 1909) provides that a defendant may set forth by answer as many defenses and counterclaims as he may have; and a railway company, sued by the employee of partners with whom it had contracted for the excavation of a tunnel and the construction of concrete walls therein (sued jointly with such independent contractors); does not, after having pleaded that it exercised no control or authority in the matter, by its further special plea that plaintiff had full knowledge of the situation and voluntarily assumed the risk of his employment, estop itself to assert its other plea that the relation of master and servant between it and plaintiff did not exist, but said special plea should be considered as a plea that plaintiff had assumed the risk of his employment by the partners, and was made in order that it might be available in case it was ruled at the trial that the relation of master and servant between plaintiff and the railway company did exist; but, the plaintiff having replied to both pleas and having failed to object that they were inconsistent, it is not necessary to rule on appeal that the special plea destroyed the other.

3. **NEGLIGENCE: Action Against Partners: Admissions by One.** Testimony tending to establish an admission by one of the defendant partners that the tools furnished were not those usually used and that the failure to supply them had some connection with their employee's injury, is admissible against all; and if made by the one before they subsequently formed themselves into a corporation, it is also admissible against such company.

4. ———: ———: ———: **Harmless Error.** An admission by one partner, in an action against the members of a partnership by their employee for damages for personal injuries, based on their failure to supply him with a safe place in which to perform his work, is material to his cause of action, if such failure contributed to his injury; but though material, if, had it been admitted, there still would have been no substantial evidence authorizing a submission of the case to the jury, its exclusion was harmless error.

5. ———: **Scaffold: Use of Ten-penny Nails.** Where the situation was one of unstable footing, and the labor-foreman, in directing the work, was not as a matter of law careless in assuming a position on the foot-board, the use of ten-penny nails driven through the upper corner of a 4x4 timber, the security of the foot-board depending upon their points reaching far enough into the adjoining timber to hold up the support when men stepped upon the foot-board, when twenty-penny nails were usually used, and the only reason ten-pennies were used, without the knowledge

Adair v. K. C. Terminal Ry. Co.

of the labor-foreman, was that twenty-pennies were exhausted, was, in view of the other facts of this case, a negligent act.

6. ———: **Unsafe Place: Injury to Foreman: Act of Subordinate.** The duty of the master to furnish a safe place in which his servants are to work is non-delegable, and applies to all situations in which the servant, whether he be foreman or common laborer, is charged by the terms of his employment with no control of the conditions resulting in his injury.

7. ———: ———: ———: **Special and General Authority.** A servant may be vested with special authority to direct the work and to that extent he represents the master, and can have no action against him for negligent acts of a subordinate servant under his control resulting in his injury; but the master has authority to distribute the work among his employees, and although the injured servant is foreman of certain servants in directing a general work, if a particular part of the work was by the master committed to one of said servants and that servant's negligent act resulted in injury to the foreman, the master is liable.

8. ———: **Excavation: Foreman of Concrete: Negligence of Carpenter.** Three days before the accident plaintiff, experienced in bridge work, excavation and concrete pouring, but not a carpenter and not experienced in wood work, was employed by partners, one of whom was superintendent, as foreman of laborers engaged in the excavation of a trench, which was to be used as a tunnel in carrying steam; to construct it, after it was excavated, sheet-piling was to be driven along its walls and then concrete was to be poured in, which, when hardened, would become the walls of the tunnel. The superintendent directed plaintiff to proceed, with his gang, to construct the wooden forms for holding the concrete, and plaintiff protested that he knew nothing about such work, and thereupon the superintendent told him he would furnish him a competent carpenter to do it, and it was the negligent act of the carpenter so furnished, in constructing the scaffolding on which plaintiff stood in directing the work, which caused his injury. *Held*, that the carpenter so furnished was not a co-employee recommended and furnished by defendants to work under the plaintiff's direction, but was the master's *alter ego*, and the master is liable. *Held*, also, that it was not necessary for plaintiff to show that he was ignorant of the work in every detail.

9. ———: **Request for Certain Supplies: Others Furnished: Inspection.** Where the foreman told the carpenter to get twenty-penny nails for "toeing" the foot-board support to the corners of a 4x4 upright beam, and the carpenter went to the storekeeper and asked for twenties, the act of the storekeeper, who represented the master alone in distributing supplies, in giving him

ten-penny nails instead, was the act of the master; and since the carpenter was employed to do the very work for which the nails were to be used, the duty of inspection did not rest upon the fore-m⌐n.

10. — ——: Injury to Foreman: Intervention of Fellow-Servant. The intervention of a carpenter, furnished for a particular service, even if in some respects a fellow-servant or subordinate of the foreman of the job, does not relieve the master from the duty of furnishing safe appliances to secure the structure which by its failure caused the injury to the foreman.

11. JUDGMENT: Entirety: Reversal as to Some Defendants. Where the interests of the parties may be rightfully severed, and the rights of one respondent are not dependent on those of another, and the errors committed at the trial do not affect them jointly, the judgment, on appeal, may be affirmed as to some, and reversed and the cause remanded as to the others.

Appeal from Jackson Circuit Court.—*Hon. Thomas B. Buckner*, Judge.

AFFIRMED in part; REVERSED AND REMANDED in part.

*C. W. Prince, E. A. Harris, J. N. Beery* and *J. E. Westfall* for appellant.

(1) In considering a demurrer to the evidence or the giving of a peremptory instruction, the court should give consideration to all the evidence and all reasonable inferences to be drawn therefrom most favorable to the plaintiff. Frankel v. Hudson, 271 Mo. 495; Trebbe v. American Steel Foundry, 185 S. W. 179; Meenach v. Crawford, 187 S. W. 879. (2) Orders had been given to use twenty-penny nails in fastening the line timber to the piling, which was the size of nail customarily used for this purpose. Instead of defendants providing the twenty-penny nails they furnished ten-penny nails. It was the duty of the defendants to provide proper material and suitable appliances for the purpose of securing safety for their servants, and failure therein entailed liability for any injuries that followed by reason of such failure or neglect. Stoddard v. Railroad, 65 Mo. 514; Craig v. Railroad, 54 Mo. App.

523; Gale v. Mill Co., 159 Mo. App. 639; Scheidler v. Iron Works, 172 Mo. App. 688. (3) Where a subordinate workman complains of the possible insufficiency of a method of construction, and is assured by the employer or employer's vice-principal that the method is sufficiently safe and such employer reiterates his order to proceed as theretofore, such employer is liable for injuries due to the insufficiency complained of. McGowan v. Railway, 61 Mo. 52; Rowland v. Mo. Pac., 20 Mo. App. 463; Combs v. Rountree Const. Co., 205 Mo. 367; Bloomfield v. Wurster Const. Co., 118 Mo. App. 254; Herdler v. Stove Co., 136 Mo. 3; Sullivan v. Railway, 107 Mo. 66. (4) Even though the defect might have been discovered by the plaintiff by making an examination of the manner of fastening the line timber, yet, there is no evidence showing that the defect was glaring or so patent that a man of common prudence would not have used it, or that it was so dangerous as to threaten immediate injury, or that it was not reasonable to suppose that it might not be safely used by the exercise of skill and care; and in such circumstances, even if plaintiff knew of the defects complained of (which he did not), that did not necessarily preclude a recovery, but whether or not he was guilty of negligence in leaning against the line timber was a question of fact to be determined by the jury. Combs v. Rountree, 205 Mo. 367; Doyle v. Trust Co., 140 Mo. 1. (5) Where, however, there were furnished to the plaintiff and his co-employees materials with which to construct this scaffold, which were not proper for the purpose and which made the scaffold when constructed an unsafe and improper place for the doing of the work, then if the master employed a person to act in his place to furnish such materials, the negligence of such person so appointed to act for the master in the discharge of the duty which he owed to his employees was the negligence of the master, for which the master was responsible. Combs v. Rountree, 205 Mo 367; Swanson v. Elevator Co., 22 N. D. 563. (6) It is the positive duty of the master to provide a reason-

ably safe place to work although the place is shifting and temporary. Likewise, it is equally well settled that any agent or employee to whom any part of this duty is delegated, becomes the vice-principal, for whose negligence the master is liable. Corby v. Tel. Co., 231 Mo. 417; Jarrell v. Coal Co., 154 Mo. App. 552. (7) Under the evidence and the law the workman who furnished the ten-penny nails instead of the twenty-penny nails and the workman who used them in constructing the shoring was a vice-principal of the defendants in furnishing the materials and providing a place in which plaintiff was required to work. Russ v. Railway, 112 Mo. 53; Bowen v. Railway, 95 Mo. 278. (8) The plaintiff introduced in evidence the third paragraph of the answer of the defendant, Terminal Ry. Co., which tendered the defense of assumption of risk. Assumption of risk being a matter of contract, and not of conduct, it necessarily follows that by this defense the defendant railway company admitted, and in effect charged, the relation of master and servant to exist between defendant railway and plaintiff. A necessary implication in a pleading is the same as an allegation. Burt v. Nichols, 264 Mo. 1; Johnson v. United Railways, 227 Mo. 423; Fish v. Railway, 263 Mo. 106. A party must abide by the statements made in his own pleadings and is absolutely concluded by the statement therein contained. Weil v. Posten, 77 Mo. 284; Knoop v. Kelsey, 102 Mo. 291. (9) "It is the doctrine of the Missouri courts that the pleadings of the party are admissible in evidence, where they contain admission or statements against his interests." Meriwether v. Knapp & Co., 224 Mo. 617; Hendrick v. Ry. Co., 159 Mo. App. 190. (10) One of the defendants, Mr. Patrick O'Hagan, stated, "that he was sorry that the supply of twenty-penny nails had become exhausted, that it was only for a short duration, but at the time that Russell, a workman, had asked for them they gave him ten-penny nails." Plaintiff's offer to prove this statement was excluded on defendants' objection. A statement made by a party litigant, which is pertinent to the

issues and against his interest is competent and admissi-ble as againt that defendant; and the fact that there are other defendants in the case does not effect its compe-tency.    Forrister v. Sullivan, 231 Mo. 345.    (11) And where such a statement or admission is competent against a party defendant it is also admissible against his co-defendants, for whom he is vice principal, and this notwithstanding the fact that it was made after the occurrence complained of.    Malecek v. Railway Co., 57 Mo. 1;    McDermott v. Railway Co., 87 Mo. 285.

*S. W. Moore, John H. Lathrop* and *J. R. Bell* for respondent Kansas City Terminal Railway Company.

(1) It is contended that the plea of assumption of risk in the amended answer of the Kansas City Termi-nal Railway Company constitutes an admission that the appellant was an employee of the Kansas City Terminal Railway Company.    It is submitted that this plea in the answer, in view of all the pleadings and evidence in the case, cannot be taken as an admission that the relation of master and servant existed between Herschel C. Adair and the Kansas City Terminal Railway Company.    The allegation of assumption of risk does not say that ap-pellant was an employee of the Terminal Company; it merely alleges that the alleged injuries arose out of the risks of the employment in which the plaintiff was en-gaged.    Then follows a plea that the injury was caused by the negligence of fellow-servants and then follows a direct allegation to the effect that the plaintiff, at the time and place mentioned in his amended petition, was an employee of defendants O'Hagan & Lake and was not an employee in any manner whatsoever of the Terminal Company, and that O'Hagan and Lake were independent contractors.    Certainly in view of these direct allega-tions it cannot be contended that there was an admission that the appellant was an employee of the Terminal Company.    Under Sec. 1807, R. S. 1909, a defendant may set forth by answer as many defenses or counter-

claims as he may have. Of course, if the evidence had established that Adair was an employee of the Terminal Company, then the company would have been in a position to take advantage of its plea of assumption of risk.

*Hogsett & Boyle* for respondents O'Hagan & Lake.

(1) There is no evidence that the method of fastening the lining timber adopted by O'Hagan & Lake, to-wit, by toe-nailing it with twenty-penny nails, at either end, was not reasonably safe.. (2) Plaintiff was a straw boss or foreman. It was his duty to see that this work was properly done. He leaned against this lining timber without ever knowing whether the laborer had finished nailing it or not—in fact, without even knowing whether it was nailed at all or not. He was negligent as a matter of law. Kelly v. Railroad Co., 105 Mo. App. 365; (3) It was not the duty of the master to cause this section of sheeting to spring instantaneously into place, fully built with the timbers fastened and ready to be walked on. The master cannot be held liable in any event in this case because the section was in process of construction, and it does not appear that the men had even finished nailing or fastening the lining timber. Bradley v. Railway Co., 138 Mo. 302; Armour v. Hahn, 111 U. S. 318; Bradley v. Tea & Coffee Co., 213 Mo. 320; Henson v. Armour, 113 Mo. App. 618; Kelly v. Railroad, 105 Mo. App. 365; Anderson v. Granite & Const Co., 178 S. W. 737. Even if Mr. O'Hagan himself had been building the section there could be no liability, because the work was not finished. But plaintiff himself was the agent to whom had been delegated the duty of overseeing this work—he was the only vice-principal present; it was his duty to see that the master's orders were carried out. Kelly v. Railroad, 105 Mo. App. 365. (4) The negro laborer who worked in plaintiff's gang, under plaintiff's direction, and whom plaintiff was directing at the very moment of plaintiff's injury, was of course not a vice-principal. Plaintiff himself was the only

vice-principal present. Forbes v. Dunnavant, 234 Mo. 55; Russ v. Railway Co., 112 Mo. 53; Bowen v. Railway, 95 Mo. 278; Moore v. Railway, 85 Mo. 588; Burkard v. Rope Co., 217 Mo. 482. Even under the state of facts claimed by plaintiff's counsel to exist, the negro laborer was at most a fellow-servant with the plaintiff, for whose negligence (if the negro was guilty of negligence, which we deny) the master would not be liable. Forbes v. Dunnavant, 234 Mo. 55; Parker v. Railroad, 109 Mo. 408; Henson v. Stove Co., 151 Mo. App. 234; Bradley v. Railway Co., 138 Mo. 302. (5) We may concede plaintiff did not assume the risk of the master's negligence. There was no negligence on the part of the master. But plaintiff did assume the usual and ordinary risks incident to the work in which he was engaged. Morris v. Pryor, 198 S. W. 817; Patrum v. Railroad, 259 Mo. 122; Blundell v. Mfg. Co., 189 Mo. 552; Pulley v. Standard Oil Co., 136 Mo. App. 172; Halloran v. Foundry Co., 133 Mo. 470; Leitner v. Grieb, 104 Mo. App. 173. (a) And plaintiff also assumed the risk of leaning against a part of this unfinished section of sheeting. (b) And plaintiff likewise assumed the risk arising from the negligence of the laborer, if there was any. (c) And plaintiff likewise assumed the risk which arose from his own failure and neglect to see that the master's and the plaintiff's orders had been carried out. Kelly v. Railroad, 105 Mo. App. 383. (6) The so-called admission of Patrick O'Hagan was properly excluded. (a) It did not purport to be regarding a matter of which O'Hagan had personal knowledge, nor an admission that he had given Russell the ten-penny nails, but merely that "they" had given Russell the ten-penny nails. (b) It did not purport to be an admission that O'Hagan or anyone in authority had given Russell ten-penny nails and hence was immaterial, as it did not tend to prove negligence. (c) If it had been admitted it would have proven no negligence, as there was no evidence that "they" (whoever "they" may be) had any knowledge what Russell intended to do with the ten-penny nails, and

hence there could be no possible negligence in giving the ten-penny nails to Russell, and the offer was immaterial.    Frye v. Railroad, 200 Mo. 377.    (7) In no event could the so-called admission have been received as against anyone except Patrick O'Hagan himself. Atkinson v. School of Osteopathy, 240 Mo. 355; Carson v. Stock Yards Co., 167 Mo. App. 444; Frye v. Railroad, 200 Mo. 405.

BROWN, C.,—This is a suit for personal injuries for which the damages are laid at $20,000.

The amended petition upon which it was tried states, in substance, that the defendant Kansas City Terminal Railway Company is a railway corporation owning and operating, among other railway properties, the Kansas City Union Depot; that the defendants H. P. O'Hagan, Patrick O'Hagan and Thomas A. Lake were at the time the injuries were inflicted partners, doing business under the name and style of O'Hagan & Lake, and that the corporation of the same name was subsequently organized by the same persons, its corporate stock being represented by the assets of the partnership. It also states that, at the time of the injury, the plaintiff was employed by O'Hagan & Lake in the construction of a steam tunnel for the railway company, and was directed by his employers to do the work subject to the supervision and orders of the railway company, the agents of which came upon the work and gave directions for its prosecution, which the plaintiff obeyed, although he knew nothing about the terms of the relation existing between the railway company and his employers.

The circumstances of the injury alleged in the petition will sufficiently appear in the statement of facts which follows.

The answer of the railway company contained (1) a general denial, (2) a plea of contributory negligence sufficient to cover the facts in evidence, (3) that the injury, if any, was due to the acts of the plaintiff's

fellow-servants or those whom he controlled and directed as foreman, (4) that it arose out of the risk of the employment in which plaintiff was engaged and of which he had full notice and knowledge, and (5) that plaintiff at the time and place of the accident was an employee of O'Hagan & Lake and was not an employee of the railway company, that the work on which he was engaged at the time was work of said co-partners being done by them as independent contractors under a contract with the railway company, and of which said partnership had sole and absolute control and direction, and that the railway company did not have or exercise any authority or control whatever over its employees.

The defendant partners pleaded by answer (1) general denial, (2) contributory negligence, (3) assumption of risk and (4) that the negligence, if any, consisted of acts of fellow-servants and others who were under the direct supervision and control of plaintiff as foreman in the performance of the same work.

The plaintiff replied by general denial.

The facts developed in evidence, so far as necessary to the determination of the questions at issue here, are as follows:

The defendant partners as such were, on August 14, 1913, the date of the accident, constructing for the defendant railway company a steam tunnel connecting its power-house with its Union Passenger Station in Kansas City. The railway company had inspectors on the job for the purpose of seeing that the contract was properly performed by the use of labor competent for that purpose, and at times gave directions to that end. The work consisted of a ditch seven feet wide and from seven to nine feet deep, according to the surface of the ground, lined with concrete. The plaintiff was employed as a labor-foreman or boss in the work of excavation and pouring concrete. Until about three days before the accident one Drake had been foreman in charge of carpenters engaged in erecting the temporary wooden structures necessary in putting in the

concrete lining. At that time Drake and his carpenters had been removed to another portion of the work, which was several thousand feet long, and the plaintiff was told by Patrick O'Hagan, one of his employers, to take charge of the work which Drake had been doing. Plaintiff objected, saying that he knew nothing about that work. O'Hagan told him that one of Drake's men who was experienced in the work, and could do it, would be given him. This man, a negro laborer named Russell, was accordingly transferred to his gang and remained with him until the accident occurred.

This work consisted of putting in wooden forms for the concrete lining of the tunnel and was done in sections about twelve feet in length. The outer wall consisted of sheet-piling, composed of planks about ten feet long, three inches thick and ten or twelve inches wide, sharpened at the bottom and driven into the ground close together against the perpendicular side of the excavation, edge to edge. These, when set, constituted the outside of the form. When this was done the concrete floor of the tunnel was poured between them and allowed to harden, and the wooden structure constituting the inner walls of the form was constructed inside them and all was braced, so as to withstand the pressure of the concrete to be poured between them and reinforced with steel bars, and which would, when hardened, become the lateral walls of the tunnel. The work was proceeding from south to north, and the west wall of the section under construction was being set at the time against the completed section south of it. This was done by setting and driving two of the piles at the north end. Between these and the north piles of the completed section, a timber four-by-four inches square was extended and nailed to the piling at each end about two feet from the top. The intervening planks or piles were then driven into the ground along the line of this stick, which was called a "line timber," because it served to line the sheet of piling along the outside of it.

In preparing the panel to receive this piling the line timber had been fastened at the ends with ten-penny nails "toed" in at the top, that is to say, driven through the corner of the timber so that the points entered the pile in front of it. This was its only fastening. This had previously been done with twenty-penny nails. Ordinarily it would stand practically against the perpendicular wall of the excavation, and in driving the piles with which it was to be filled the men would stand upon the top of the bank or upon the line timber or a board resting upon the ground and the line timber, as they saw fit and the situation indicated, driving the piles with a wooden maul. They also passed to and fro on this timber in doing their work. At the time of the occurrence in question there had been a cave of the earth near the south end of the panel, the adjoining earth having fallen into the bottom of the excavation, and the plaintiff stood there leaning against this timber and observing the progress of the work. On taking this position he had put his knee against the timber and found that it seemed solid. While he was leaning upon it one of the workmen stepped on it. It gave way under his weight, the nails pulling out, and he was precipitated, with the timber, to the bottom of the ditch, receiving the injuries complained of. It turned out, upon examination, that the line timber had been toed to the piles with ten-penny nails and not otherwise fastened. Before proceeding with the work as directed by Mr. O'Hagan the plaintiff had told Russell to get some twenty-penny nails for that purpose, and supposed it had been done. Russell had gone to the tool house, where the stores for that part of the structure were kept, and asked for them, and was told by the storekeeper that they were out of that size, and was given the smaller nails, which he brought back and used in the manner indicated, without disclosing the fact to plaintiff.

The plaintiff offered evidence to the effect that after the injury the defendant Patrick O'Hagan, who superintended the work, stated to him that he was sorry

for the occurrence and that the supply of twenty-penny nails had become exhausted, that it was only for a short duration, but at the time, Russell had asked for them they had given him ten-penny nails. This was excluded by the court on the objection of defendants that "Mr. O'Hagan's statement would not be binding upon any of the other defendants in the case, and for the further reason that the testimony shows, without substantial dispute, that the plaintiff himself was in charge of that work, and was the man to determine when he should go ahead with it, what nails he should use, and the testimony offered is wholly immaterial, and does not tend to prove negligence, or any issue in the case."

He also offered to prove, by witnesses whose experience and competency were not questioned, that the customary and usual method employed by reasonably careful contractors, foremen and workmen engaged in the same line of work, was, to secure a line timber to the upright, to use, in addition to twenty-penny nails, a cleat nailed to the upright beneath it. This evidence was also excluded by the court.

The defendant also offered to prove by a witness who had worked as carpenter for defendant on the same job in the same work, that, about two months before that time, Mr. O'Hagan, then superintending the work, had instructed him not to use cleats for the support of the line timbers under similar circumstances, because it was a needless waste of time and material. This was excluded by the court "for the reason that the plaintiff was in no way connected with it, and the offer is for two months preceding the time the accident occurred."

At the close of plaintiff's evidence the defendants asked that the jury be instructed to find for them, and the court thereupon gave an instruction in the nature of a demurrer to the evidence for all the defendants, upon which the plaintiff suffered a nonsuit with leave to move to set the same aside, upon which judgment was

duly entered, from which, after motion to set the same aside was overruled, this appeal is taken.

I. To clear the way for the discussion of the merits of this case it is convenient to dispose of one or two questions which meet us at the door. To ascertain who are the real parties we must first inquire into the relation existing between the plaintiff and the defendants. While there is but one plaintiff we must divide the defendants, with respect to their rights, into two classes. In the first of these the Kansas City Terminal Railway Company stands alone; the other is the co-partnership of O'Hagan & Lake composed of the other three defendants.

*Master and Servant: Railway Company.*

The plaintiff, as well as some of his witnesses testified that with respect to the work in which he received his injury he was employed by O'Hagan & Lake, and there is nothing in the testimony that tends in any way to give a broader scope to his employment. The relation of master and servant existed between them alone. To be sure, the railway company, for whom the work was being done, had inspectors on the ground, and plaintiff was instructed to conform to their directions. It is not suggested that this was not a usual and very proper method of avoiding hidden and other defects which might endanger the safety or utility of the completed structure, and there is no shadow of evidence in the record that any such interference tended in any way to bring about the accident. A careful reading of the points made by the appellant and his argument thereon confirms us in the impression that he makes no contention of that character. This accords with our own conclusion that there is no testimony tending to show the relation of master and servant between them or or that any act of that company done in the course of any supervision it might have exercised as owner over the construction, contributed to any extent to the injury complained of.

The appellant insists, however, as we understand his argument, that the railway company, by its pleading, has estopped itself from denying the relation of master and servant, and insists also upon the corollary, that whatever was done to his detriment was done or wrongfully permitted by it.

He reasons as follows:   That although the railway company pleaded in its answer, not only by general denial but by way of special defense, that no such relation as that of master and servant existed between it and plaintiff, and that the work was being done for defendant under written contract with O'Hagan & Lake, who were independent contractors charged in that capacity with the entire work, including the sole and absolute control or authority thereof, and that it, the railway company, exercised no control or authority in the matter, it also pleaded specially that the alleged injuries arose out of a risk of the employment of which plaintiff had knowledge and voluntarily assumed by the contract of service; and appellant argues that by this plea, which was founded in contract, it nullified the plea that he was working for O'Hagan & Lake and not for itself and was therefore liable as his employer, to afford him a reasonably safe place for the performance of his work and reasonably safe appliances with which to perform it.

This reasoning is too recondite and abstruse to recommend itself to our simpler process of reasoning. Even in the absence of the rules of pleading prescribed in Section 1807, Revised Statutes 1909, to the effect that the defendant may set forth by answer as many defenses and counterclaims as he may have, we would be inclined to interpret these two pleas together as meaning that appellant had assumed the risk incident to the employment by O'Hagan & Lake, the only employment mentioned in the answer.   In the light of the provision we have quoted we may and do construe it as an attempt to set forth a separate defense, to be available in case the employment should be found, as a matter of fact by the jury, or as a matter of law by the court, to create the

relation of master and servant between the railway company and the plaintiff. The plaintiff having failed to make objection to the alleged inconsistency of these allegations and having seen proper to reply to both, we are relieved from determining whether one of these pleas destroys the other and, if so, which of them survives.

We do not think that there was any evidence tending to show liability on the part of the railway company on account of the injury complained of.

II. The appellant, upon the trial, offered testimony to prove that after the accident the defendant Patrick O'Hagan told plaintiff "that he was mighty sorry for the occurrence, and that he was sorry that the supply of twenty-penny nails had become exhausted, that it was only for a short duration, but at the time that Russell had asked for them they gave him ten-penny nails." The defendant objected to the admission of this evidence on the ground that it would not be binding upon any of the other defendants, and on the further ground that the plaintiff was in charge of the work and was the man to determine when he should go ahead with it and what nails he should use, and that the testimony offered was wholly immaterial and did not tend to prove negligence or any issue in the case. It was excluded by the court, to which action appellant excepted.

That this testimony, if admissible, was an implied, if not a direct admission, of Mr. O'Hagan that twenty-penny nails should have been used for the particular purpose, that the contractors were temporarily without a supply of such nails, that they gave Russell, the workman sent for them, ten-penny nails instead, and that the use of these smaller nails in the work had some connection with the accident about which he was speaking at the time, is evident. That it was material upon the issue made by the pleadings there can be no doubt. That it was therefore admissible as against the defendant who made it is equally certain, and that it should

have been admitted logically follows. For this reason
it was before the trial court in' ruling upon the motion
to set aside the nonsuit. All this is practically admitted
in argument, so that it must be included in determining
whether the court committed error in taking the cause
from the jury and thereby forcing the nonsuit as to all
the defendants. In determining this we are still con-
fronted with the important question whether or not this
admission is competent as against the other defendants,
members of the co-partnership of O'Hagan & Lake.

As co-partners their interests were identical. The
interest of each covered the entire ground of the alleged
liability to the plaintiff. It was indivisible in origin,
amount and remedy. In its origin each acted and spoke
for all. In amount each was responsible for all. As
to remedy it could not be apportioned by the court in
the action. It was admittedly a partnership matter,
undetermined and unadjusted, and all are parties to the
record as well as to the entire cause of action. The
question arises as to whether the admissions of each
against the interest of all alike have any effect as evi-
dence against the others.

This is an old question in this State. It was before
this court in Armstrong v. Farrar, 8 Mo. 627, which was
a suit by the heirs of a testator against the joint de-
visees of lands, for the purposes of setting aside the
will for incapacity. The court held that the admission
of one of the defendants relating to that question was
admissible in evidence against all. In its opinion by
NAPTON, J., this court said, after an examination of
numerous authorities: "We are not disposed to de-
part from the rule laid down in Phillips, Starkie and
Greenleaf. It is thus stated by Mr. Greenleaf: 'If the
parties have a joint interest in the matter in suit, wheth-
er as plaintiffs or defendants, an admission made by
one, is, in general, evidence against all. They stand to
each other, in this respect, in a relation similar to that
of existing copartners.' "

It was again before this court in Hurst v. Robinson, 13 Mo. 82, a case which we are unable to distinguish, in its facts, from the one now before us. In that case the partnership had long been dissolved, while in this it has been converted into a corporation. The court, speaking through RYLAND, J., said: "The principle involved in this question, has heretofore demanded the attention, and received the consideration of this court. In the case of Armstrong v. Farrar, 8 Mo. 627, this question came up, and after a review of many decisions, the court express their unwillingness to depart from the rule laid down in Phillips, Starkie and Greenleaf. It is thus stated by Greenleaf: 'If the parties have a joint interest in the matter in suit, whether as plaintiffs or defendants, an admission made by one, is, in general, evidence against all; they stand in this respect to each other, in relation similar to that of existing copartners.' We still adhere to the views of this court given in that case, and consequently we see no error in the admission of this evidence in the court below."

The question again came before this court in Railway Co. v. Fowler, 142 Mo. 670, which was a proceeding for the assessment of damages in the condemnation of land. The defendants were tenants in common, each of an undivided half. It was stipulated that the damage should be assessed equally to each. The court, by MAC-FARLANE, J., in holding that the admission of one of the contenants was admissible against both, said: "It is well settled law, at least in this State, that if parties prove a joint interest in the matter in suit, whether as plaintiffs or defendants, an admission by one is, in general, evidence against all. [Armstrong v. Farrar, 8 Mo. 629; Hurst v. Robinson, 13 Mo. 83.] The legal effect of the stipulation is that each party waived all objection to evidence which was admissible against the other. The parties placed themselves in the position of joint owners in respect to the damages to be assessed, and on the trial should not be permitted to *shift* their position, and claim as tenants in common, in order to prevent the introduction of evi-

dence which would be competent if the ownership was joint. We do not think defendants can complain, though the admissions of Rothan, in the absence of the stipulation, would not have been admissible against the other defendant.''

This general question afterwards came before the court in Schierbaum v. Schemme, 157 Mo. 1, which was a proceeding by an heir against certain devisees and legatees of specific portions of the testator's estate to construe the will of one Henry Schemme, deceased, for incapacity and fraud. An important question in this court related to the admissibility of certain statements of one of the beneficiaries as against the other contestees. VALLIANT, J., in an exhaustive opinion in which all the judges of Division Number One concurred, and in which he examined the leading authorities of this and other states, including the cases to which we have already referred, came to the conclusion that the rule stated in Armstrong v. Farrar, supra, while ''it is correct as applied to cases of joint interest, is no longer to be regarded as the correct rule applicable to devisees or legatees holding separate rights under a common will.'' Judge VALLIANT recognized the fact that the contest involved the existence of the will, so that whatever might be the result, it carried with it the interest of all beneficiaries without regard to their privity of interest or design, saying: ''These confessions are not the confessions of the others, who have a separate interest. It is not like the case of joint partners, where the confessions of one may be used against both.'' It will be seen that this case, while qualifying Armstrong v. Farrar in so far as it *might* apply to those having separate and distinct interests in the common subject of litigation, not only leaves unimpaired the doctrine established by the court in Hurst v. Robinson, supra, and Railway v. Fowler, supra, but expressly recognizes its soundness.

This court again made this distinction in Meier v. Buchter, 197 Mo. 68, a suit ''to set aside the will of Theodore Albert Thomas, charging undue influence and

fraud—the product of a conspiracy between proponents—
and testamentary incapacity." In that case the trial
court had excluded testimony of statements and admis-
sions made by some of the contestees. This court, after
quoting Schierbaum v. Schemme, supra, said: "It will be
seen that devisees having a 'joint interest' stand on a dif-
ferent footing as to admissions than do those devisees who
have no such interest. In this case it is not necessary to
judically interpret the phrase 'joint interests.' Because,
under certain conditions, the rule in the Schierbaum case
would not be applicable and should not be mechanically
applied to the facts in this case. Here the petition al-
leges, in substance, that there was a conspiracy between
all the contestees to defraud, and it is elementary law
that when there has been evidence tending to show a
conspiracy exists, the admissions of any one of the con-
spirators along the line of the conspiracy, touching its
subject-matter, and in furtherance thereof, are admis-
sible. Therefore, in the retrial of this case if there should
be testimony introduced fairly tending to show privity
of design in the concoction of this will by the contestees,
Mrs. Buchter, Timmer, Riddle and Kirchner, it is our
opinion that after the introduction of evidence, if any
there be, tending to the establishment of such privity of
design, is introduced, the admissions of any one of the
conspirators should be accepted."

It will be seen that all the cases agree upon the doc-
trine expressly held in Hurst v. Robinson, supra, that
where the action is founded upon a partnership liability
the admission of one partner is evidence against all.
This doctrine is too well founded in reason to be shaken.
In such a case the interest of each is identical. It extends
not only to the entire recovery, but covers the entire
ground of liability. The same identity of interest existed
in Railway Co. v. Fowler, supra, only by agreement made
for the purpose of the trial, and the same principle was
applied. In Meier v. Buchter, supra, the interests of the
parties were several and not joint, but the *cause of action*
lay in conspiracy to commit a fraud, which required

"privity of design" to support it, and the rule was applied upon that ground.

The case of Atkinson v. School of Osteopathy, 240 Mo. 338; Frye v. Railway Co., 200 Mo. 377; and Carson v. Stock Yards Co., 167 Mo. 444, cited by the respondents, have no application whatever to the subject of this transaction, but apply exclusively to admissions made by a disinterested agent so long after the injury that they do not constitute any part of the *res gestae*.

We think there was error in the exclusion of this testimony and that, for that reason, it should be considered in determining the real question in the case—that is to say—whether the nonsuit forced upon plaintiff should be permitted to stand. If, had this testimony been introduced as offered, there would have been no substantial evidence to authorize the submission of the case to the jury, then the error excluding it was harmless.

III.    The work about which the plaintiff was employed was the digging of a ditch from seven to nine feet deep and seven feet wide, and converting it into a permanent tunnel for the transmission of steam. The sides of the excavation were perpendicular. The entire structure was several thousand feet in length. The tunnel was completed in sections of twelve feet. In this section, seven feet wide and twelve feet long, all the material, consisting of timber of various dimensions and crushed rock and cement, had to be handled and used. It was, although a small hole, a busy place. It was natural that, as the evidence shows, the perpendicular walls of earth should cave and thus necessitate continuous work in removing the debris until the retaining wall of sheet-piling, 3-by-10 or 12 inches, and 9 or 10 feet long, should be completed to keep it back. These heavy piles were driven into place in the ground and further secured by a concrete footing. They were placed in line and held by 4-by-4 line timbers at an elevation near the average surface of the ground These timbers were held in place by nailing—one end

<span style="font-variant: small-caps">Negligent Act.</span>

to the last pile of the completed form adjoining, and the other to a pile or two set for that purpose at the end of the section under construction. The space so included, bounded at the bottom by the earth, at the top by the line timber seven or eight feet above, and at each end by the piles to which it was nailed, constituted a panel or section which was being filled with continuous piling at the time of the accident. They were driven with wooden mauls by men employed in the work. It was necessary that these men should stand somewhere to strike the tops of the piles. The ground was uneven, so that the ditch, according to the evidence, varied in depth, and there had been a cave at the time at the place where the plaintiff stood leaning against the line timber and directing the men below about removing the earth. It is evident that under these circumstances the men could not stand upon the bank of the ditch to drive, so they sometimes stood upon the line timber and sometimes on a plank, one end of which was laid upon the timber and the other upon the solid earth, and the men used the timber as a foot way as necessary in going from place to place. At the time of the accident the line timber had been placed in position, completing the panel to be filled by the intervening line of sheet-piling, and the men were ready to proceed with the work. The line timber had been nailed at the ends, as we have stated, with ten-penny nails toed in at the top, and the plaintiff stood in the place where the top of the ground had caved in, with his legs leaning against the timber, directing the excavation below, when a workman stepped upon the timber and it fell to the bottom of the excavation with other debris, the plaintiff going with it, and suffering in the fall the injury complained of.

Although there was direct evidence that these nails were insufficient to secure the timber in its place for the purpose of its use as a scaffold or runway for the men, we do not deem it necessary to consider it in detail. It had always before been done with twenty-penny nails, which had proved up to that time sufficient for the pur-

pose. The words "ten-penny nails" are in common use, and no more definite description is needed to indicate the instrument they describe. The evidence excluded and referred to in the last paragraph admitted their insufficiency for the purpose and the result demonstrated it. The support of the scaffold upon which men were required to work, with nails three inches long driven into and through the upper corner of a 4-by-4 timber, and depending upon their points reaching far enough into its only vertical support to hold it under such use, was itself an evidential fact to be considered from the standpoint of general experience in connection with the entire evidence bearing upon the question, from which the jury might well have found that the act was negligent and the accident was the natural and reasonable result. The situation was one of unstable footing, and there is nothing in the testimony from which the jury could be required as a matter of law to find that the plaintiff was careless in assuming the position which he did in leaning against and over the timber to observe and direct a shoveler in the bottom of the trench. The only matter for consideration is to fix the responsibility for the alleged negligent construction we have described.

IV. The appellant contends that the conditions we have described rendered the place in which he was required to work unstable and unsafe, and the evidence, as we have already shown, tends definitely to support him in his contention. Had the laborer who stepped upon the timber and under whose weight it was wrenched from its meager fastening and fell into the trench been injured by his fall he could evidently have complained of the failure of the master to perform the non-delegable duty to furnish a reasonably safe place for the performance of his work. Had the timber fallen upon a laborer working in the bottom of the ditch the defendant would have been liable upon the same ground. This rule applies to all cases in which the servant is charged by the terms of his employment with no control of conditions resulting in

his injury. [Corby v. Telephone Co., 231 Mo. 417.] It excepts from its protection all who participate in a common employment which includes this duty. These are all fellow-servants with respect to the common master.

Another phase of the same principle is suggested in the facts of this case. The master is frequently represented at the place where his work is performed by one having authority to direct it. He may occupy that position with reference to special matters without general authority. With respect to those under his direction he represents the master, against whom he can have no action with reference to the negligence of those whose acts come within the limits of his own authority.

Keeping these general principles in mind we will examine the relation between plaintiff and defendants with reference to the liability of the latter in this action.

The evidence tends to show that until three days before this accident the plaintiff had been employed by the defendants as 'a foreman of laborers engaged in the excavation of the trench which constituted the initial phase in the construction of this tunnel. He was a young man of some experience in constructive work. He had been employed in bridge work, principally in excavation, and had considerable experience in the operation of the pile-driver, but the evidence does not show that he was a carpenter or had experience in the kind of timber work connected with this accident. Up to the time we have indicated, his work for these defendants had consisted solely in excavation and concrete pouring, and he had taken no part in the carpenter work which was necessary to prepare the trench for the reception of its concrete lining. During all that time one Drake had been in charge of a gang of carpenters and their helpers doing the wood work.

The evidence tends to show that on or prior to that day Drake was removed to another section of the tunnel where the same work was proceeding. At that time the excavation on the section where this accident occurred was nearing completion. The defendant Patrick O'Hagan

represented the defendant contractors in the capacity
of general superintendent of the work. He told plaintiff
of Drake's employment elsewhere with his gang, and
when the trench was ready, to proceed with the lining
and forms with his own gang. The plaintiff protested
that he knew nothing about the work, and to avoid this
objection Mr. O'Hagan told plaintiff that he would give
him one of Drake's carpenters who did know about it
to do it. He told him that the man whom he would fur-
nish for this purpose was Russell and that he was a
competent man. Mr. O'Hagan was not only under the
legal obligation to use reasonable care to avoid anything
coming within the line of his general authority which
would increase dangers incident to the employment of the
plaintiff but was interested in the cost of the work to him-
self and the promptness with which it could be done in
compliance with his contract. This is well illustrated by
the testimony offered by the platniff and excluded by the
court that he had previously forbidden the use of cleats
for the direct support of these line timbers, because it
would be a useless waste of both time and material. Both
of these were elements of his profit to accrue in the per-
formance of his contract. We do not wish to be under-
stood as holding that the court committed error in the
rejection of this testimony, for there is nothing to indi-
cate that the timbers could not be properly and safely
supported by the use of the twenty-penny nails, the
greater length of which would give them a greatly supe-
rior hold upon the piles which constituted the support of
the structure, but merely to illustrate the interest of the
master in connection with his duty to his servant; an
interest which covered the elements of both cost and safe-
ty, and suggests the question to what extent the risk
of the latter might be imposed upon the servant in the
interest of the master's protection from the former.

That the master had the authority to distribute his
work among his employees is unquestioned, and all au-
thority which they may exercise over others emanates
from him alone and is subject to his direction and con-

trol.  He may direct the one shall prepare the place in which others may work and that one becomes thereby his representative in that respect.  It therefore becomes important to inquire what relation Russell sustained to the plaintiff and defendants respectively.

The evidence tends to show that he was assigned by the defendants to the particular duty in question because the plaintiff knew nothing about the work and had notified them of that fact, while Russell was, in their opinion, competent to do it in such a manner as to protect them in their responsibility with respect to the safety of others.  The plaintiff insists that in this respect Russell was selected by them as the *alter ego* upon whom that duty devolved, while the defendants say that he was only a co-employee recommended and furnished by the defendants to work under the direction of the plaintiff in the performance of his duty.  When Adair declined to do the work on account of his incompetency, Mr. O'Hagan might well, and perhaps did, formulate the same legal proposition in the following concrete form: "Mr. Adair is responsible for the conduct and competency of the men in his charge.  I will employ a man to do this work which he does not know how to do and put him in Adair's gang, where he will be the subordinate or the fellow-servant of all who are in position to be injured by his acts, and stand between me and liability."

This proposition does not recommend itself to us.  In so far as the conduct of this carpenter work affected the safety of the place to those employed there in other occupations, including plaintiff, who declined for the best of reason to assume the responsibility, it was the master's work.  We think that in this respect Russell represented the master to the extent that the master was responsible for his acts, in so far as they pertained to the performance of the duties to which he was assigned because of the avowed ignorance of the plaintiff.  For the purpose of enforcing such liability it is unnecessary to show that plaintiff was ignorant of the work in every detail.  Had the master himself undertaken it under the same circum-

stances and for the same reason, the plaintiff might have questioned his method of performing it and even have protested against it without creating the relation of fellow-servant between them, and we can see no good reason why the same principle should not apply between the plaintiff and the master's representative. With these principles in view we will consider the various acts out of which this controversy arises.

The plaintiff knew that twenty-penny nails had always been used in this work. As a reasonable man he should have known, had the matter been put up to him, that ten-penny nails were not reasonably safe for that purpose. When he got ready for the work he told Russell, and directed him to go to the place where the defendants kept such supplies and get twenties for that purpose. Russell attempted to do so. He went to the place and asked the storekeeper for twenty-penny nails and was given ten-penny nails instead. This was the act of the master himself. There was no privity of employment between the storekeeper and Russell, nor between the storekeeper and plaintiff. The storekeeper represented the master alone in distributing the appliances and materials to be used in the work. He was charged with the knowledge of the master that these appliances were necessary in its safe prosecution and the admission of Patrick O'Hagan, to which we have referred in a preceding paragraph, is an admission that the defendants knew, through him, that Russell had been given inferior unsafe appliances to secure the timber, instead of appliances that were suitable and safe for which he had asked. The reason given was not that he had failed to ask for them, nor was it that the contractors did not know the use to which they were to be applied, for they did know that the very first item of carpenter work for which nails were to be used was the erection and securing of this stick. Russell was employed by them to do that very thing because the plaintiff did not know how to do it, and we do not see that under these circumstances the duty of inspection was

imposed upon him. So far as Russell performed the duty of an expert in that construction he performed it for the master and not as a co-servant of one who had declined the responsibility. The furnishing of the unsuitable nails for the work was the act of the master alone.

It will be seen that this case comes directly within the principle stated in Arkerson v. Dennison, 117 Mass. l. c. 412, and quoted and approved by us in Bowen v. Railway Co., 95 Mo. l. c. 277, and Combs v. Construction Co., 205 Mo. l. c. 387, as follows: "When the preparation of the appliances is neither entrusted to nor assumed by them, the master may be held guilty of negligence, if defective appliances are furnished, even though the *workmen themselves are employed in the preparation of them.*" That the intervention of Russell, even if, in some respects, he was the fellow-servant or subordinate of the plaintiff, does not relieve the defendant from the duty of furnishing safe appliances to secure the structure which by its failure caused the injury to plaintiff, is well illustrated in Scheidler v. Iron Works, 172 Mo. App. 688. In that case the plaintiff was employed in galvanizing iron work upon a tower upon which he swung himself from a hook fastened at the top of the tower. Needing such a hook he sent his helper to the tool house of the defendant where there was none to be found. The helper then went to the defendant's blacksmith shop and ordered one to be made. On returning to the blacksmith shop to get it he found it too hot to handle and asked the blacksmith if he might cool it in a tub of water. The blacksmith gave his permission, and he did so. On his return he gave it to the workman who sent him for it. The workman undertook to use it, but the sudden cooling had made it brittle, so that it broke, precipitating him to the roof below, inflicting the injury for which he sued. The St. Louis Court of Appeal in its opinion said: "Whatever may be said touching the liability of a master, it is certain that the fellow-service exception thereto does not obtain where the

breach pertains to a non-delegable duty of the master, for in such cases he may not escape responsibility through authorizing another to perform his obligation. Among the non-delegable duties of the master is to exercise ordinary care to the end of furnishing the servant with a reasonably safe appliance for the performance of the undertaking in which he is engaged.'' The liability of the master for an injury caused by unsuitable and unsafe material for the construction of a scaffold as in this case has been frequently declared by the courts. [Swanson v. Elevator Co., 22 N. D. 563; Richards v. Hayes, 45 N. Y. Supp. 234.]

It follows from what we have said that the action of the trial court in refusing to set aside the nonsuit as to the defendant Kansas City Terminal Railway Company was right. Whatever may have been the instability of this court with reference to the entirety of a judgment in this respect, it is now established that, on appeal, the interests of the parties may be rightfully severed where the errors do not affect them jointly, and the rights of one are not dependent on those of another, and the judgment be reversed as to some and affirmed as to others. [Stotler v. Railroad, 200 Mo. 107, l. c. 149-50.] In the case just cited many Missouri authorities were collected, to which we refer for further information on that point. The judgment of nonsuit as to that defendant is accordingly affirmed.

For the reasons stated the judgment of the circuit court is reversed as to the other defendants, and the cause remanded to that court for further proceedings in accordance with this opinion.

PER CURIAM:—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All of the judges concur.