LESLIE BOSTON v. KROGER GROCERY & BAKING COMPANY, and ROLLA WELLS, Receiver of UNITED RAILWAYS COMPANY, Appellants.— 7 S. W. (2d) 1006.

Division Two. June 21, 1928.

*Jones, Hocker, Sullivan & Angert* for appellant.

*C. J. Krueger* and *Frank Coffman* for respondent.

HIGBEE, C.—Plaintiff, an employee of the Kroger Grocery & Baking Company, sued the defendants for damages for personal injuries resulting from a negligent collision of a street car operated by Rolla Wells, as receiver, with a truck of the Kroger Grocery & Baking Company, in which plaintiff was riding. The amended petition charges negligent operation and collision of the truck and street car at the intersection of Newstead Avenue and Hodiamont Street in the city of St. Louis, without using ordinary care to foresee or avoid a collision. The answer of each defendant is a general denial. Plaintiff had a verdict for $20,000 damages. Pending motions for new trial, a *remittitur* in the sum of $7500 was entered and judgment was rendered for plaintiff against both of the defendants for $12,500, from which separate appeals were allowed. By stipulation these appeals have been consolidated and argued and submitted on one abstract of the record.

It has been stipulated also that if the judgment "is reversed outright or affirmed as to the defendant Kroger Grocery & Baking Company, then it shall be affirmed as to Rolla Wells, Receiver of the United Railways Company of St. Louis; and if said judgment is reversed and remanded as to defendant Kroger Grocery & Baking Company, then the same shall be remanded for a new trial as to Rolla Wells, Receiver of the United Railways Company of St. Louis."

There is little, if any, disagreement between learned counsel as to the facts.

Adolph Pheedler testified: I was superintendent of transportation for the Kroger Grocery & Baking Company in December, 1923. The company maintained trucks of various sizes for delivery purposes; one was a tractor and trailer about thirty feet long. Harold Shields was the chauffeur or driver of one of these trucks. Leslie Boston, the plaintiff, was employed as a helper on the truck. I hired him. I told him his duties were to help on the truck; do anything the driver told him to do after they got away from the plant. He took his orders from the driver; he had to ride on the back end of the trailer; he had nothing to do with the driving. When the truck and trailer leave the warehouse they are usually full of merchandise, but there is usually room for the helper to ride in the trailer. The duty of the driver and helper is to deliver merchandise to the various Kroger Company stores in St. Louis. When they left the warehouse with a loaded truck the driver was given a route sheet with directions as to the route and order of delivering to the various stores. In addition to driving the truck the driver assisted in loading and unloading the merchandise. On December 3, 1923, when the truck and

trailer were returned to the Kroger Company garage, I noticed a mark of yellow street-car paint on the right rear corner of the trailer. The plaintiff had been working for the company for about a year. The route sheet, with the addresses, was given to the driver. When the driver and helper arrived at a store they both took part in unloading the goods and if. there was anything to be returned to the warehouse both helped in loading the same on the truck.

Harold Shields testified: I was the driver on December 3, 1923. Boston and I started out with the loaded truck and trailer at about 6:30 A. M. I kept the delivery sheet and kept the helper informed. We finished our first load, and returned and got a second load about noon and delivered all afternoon. Boston and I divided the work. Sometimes I delivered to one store and Boston at the next. While I drove from one store to another, Boston rode in the trailer, placing the goods ready for the next delivery, and to keep them from falling out of the trailer. It was a dark, drizzly, rainy day and the streets were wet. I was driving south on Newstead Avenue. On approaching the crossing of the street car lines at Hodiamont, I looked and listened; could not see or hear anything. I knew it was a street car line and that cars ran on it. I started to drive across. When my front wheels were on the north or westbound track, I saw a street car coming from the west on the south track; it was about seventy-five feet distant. I thought the street car would slow down and that I had time to continue across. The street car struck the rear end of the trailer. I was driving six or eight miles an hour and could have stopped in one, two, or two and a half feet. The force of the collision caused the trailer to swerve, and the left wheel of the trailer hit the curb on the east side of the street. I found Boston unconscious. He was lying along the eastbound car track. He was taken to the hospital.

Other evidence shows that the street car stopped in Newstead Avenue, and that Boston was taken to the city hospital; was treated for fracture of the skull; that he was unconscious for about eight days and remained in the hospital until December 28th.

Harry Steerman, motorman on the street car, testified that the track was straight and clear for two blocks west of the crossing; the street car was running about five miles an hour and could have been stopped within fifteen feet; that when he first saw the trailer it was about five feet ahead of him and there was nothing to prevent his seeing it; the bell was ringing all the time and the headlight was shining. He had slowed down for the crossing. The street car continued running for about fifteen feet after hitting the trailer and stopped in Newstead Avenue. There were no lights on the trailer.

Harold Ross was working in a grocery store at the southeast corner of the intersection. He heard the crash of the collision, went

out and saw the trailer backed up against the curbing in front of the store. The trailer was facing south in Newstead Avenue and the street car had stopped. Boston was unconscious and lying on the tracks, six or eight feet in front of the street car. The end-gate of the trailer was lying in the street. The conductor and motorman had got off by this time and Boston was carried into the store. The ambulance came for him in fifteen or twenty minutes.

Leslie Boston, the plaintiff, testified: I was hired by Mr. Pheedler to help the driver and told to do what the driver told me to do. My work was delivering groceries to retail stores; the driver and I would unload the groceries at the stores, and reload anything to be taken back to the warehouse. I did most of the reloading. I was told to ride at the rear end when there was room there; the driver told me to watch the groceries. The driver was at the front end to drive. I did not work for the same driver all the time, but worked for different drivers. I worked with Shields about one week before the collision. Shields did not tell me anything I was to do; I had been told by other drivers. I remember going to work the morning of the day I was hurt, but I remember nothing after going out. The driver would every time tell me what the next store was, and tell me to work the stuff back towards the gate to have it handy for the next stop. The goods were loaded in the trailer in the order of delivery and were separated by dividers.

Plaintiff read in evidence the Vigilant Watch Ordinance requiring the motorman in charge of a street car to keep a vigilant watch for vehicles and persons on the track or moving towards it, and on the first appearance of danger to such persons or vehicles to stop the car in the shortest time and space possible.

Plaintiff offered evidence as to the nature and extent of his injuries, but as appellant is making no point on that feature of the case it will be omitted.

At the close of plaintiff's evidence and again at the close of the whole case, each of the defendants offered an instruction in the nature of a demurrer to the evidence. They were refused.

Counsel for the Kroger Grocery & Baking Company assign as error the overruling of its demurrer on the ground that if there was evidence of negligence in connection with the operation of its truck, it was the negligence of the driver who was plaintiff's fellow-servant, for which the company is not liable.

There is abundant evidence that Shields was negligent in driving the truck and trailer over the crossing directly in front and in close proximity to and in full view of the approaching street car, and that such negligence was the proximate cause of plaintiff's injuries and that Shields was acting in the line of his duty as the defendant's employee at the time.

Respondent's learned counsel contend that when plaintiff and Shields were away from defendant's plant, Shields was in charge of the deliveries with full authority to direct the plaintiff in all respects; that plaintiff was ordered to ride in the trailer and did not have anything to do with operating the truck and could neither foresee nor avoid danger; hence they were not fellow-servants, but Shields was respondent's vice-principal.

It will be conceded that Shields and Boston were servants of a common master. On the evidence it is clear that under certain conditions Shields would have sustained the relation of vice-principal to Boston, while under others they would be classed as fellow-servants. The question is, what was their relation to each other at the time Boston was injured?

They were employed by appellant to deliver merchandise to the various Kroger stores in the city. They were working for a common master to accomplish a common purpose. Shields had the delivery sheet and was to drive the truck; Boston was to ride in the trailer, watch the goods and, between stores, get them ready for delivery at the next stop. When that was reached, the two were to make the delivery, in which they mutually assisted each other. Clearly Boston was injured by the collision, and not while the driver was exercising any control over him, but while they were engaged in the common employment. We quote from appellant's printed argument:

"Whatever construction be put upon the testimony that the plaintiff was to do whatever the driver told him to do, it is manifest that the driver was not engaged in any active superintendency over the plaintiff while driving from one store to another and at the time the plaintiff was injured. As a matter of fact, the plaintiff testified positively that Shields never gave him any orders with respect to his duties, because he knew his duties from experience with other drivers. The work of the plaintiff in riding in the trailer and watching the merchandise was just as much a part of the work of delivering the merchandise as was the act of the driver in driving the truck to the next store. They were engaged in a common enterprise at the time and were fellow-servants under the law as repeatedly declared in this State.

"In McIntyre v. Tebbetts, 257 Mo. 117, 165 S. W. 757, the driver of a large wagon, used for hauling merchandise from defendant's factory to the depot, was empowered to employ men to assist him in loading and unloading, with control of the men hired. He hired the plaintiff and on the way to the depot directed plaintiff to perform an errand while he waited for him with the wagon. When the plaintiff returned to the wagon, and while attempting to climb therein, the driver prematurely started the wagon, injuring the plaintiff. It was held by the Court en Banc that in hiring the men and controlling

their work, the driver was a vice-principal, but in driving he was a fellow-servant, and that the plaintiff was not entitled to recover. The court said, l. c. 127-9:

" 'Long reflection has failed to reveal how Kuhr's act of driving forward involved an exercise of authority. It seems to us to have been beyond doubt an act of common service which was done in the course of his ordinary task. We cannot imagine a case wherein a person who is both foreman and common employee could do an act more clearly pertaining to the latter capacity rather than foremanship, than was Kuhr's starting the team.'

"In Rowe v. United Railways Company, 211 Mo. App. 526, 247 S. W. 443, 447, the St. Louis Court of Appeals had before it a case practically the same as the case at bar. It was a suit by a helper against the United Railways Company and the Kroger Grocery & Baking Company for injuries resulting from a collision between a street car and a truck similar to that in the case at bar. After stating the facts the Court of Appeals said in that case:

" 'We have set out all of the testimony which appears in the record with reference to the character of plaintiff's employment and as stated above can come to no other conclusion but that plaintiff, Rowe, and the driver, Tufts, and the other helper, Mulderig, were at the time of the collision engaged in the common employment, namely, the hauling and delivering of packages, and that plaintiff was a fellow-servant to the said driver, Tufts.'

"In McCall v. Nugent Dry Goods Co., 236 S. W. (Mo.) l. c. 326, Judge WHITE, in discussing the McIntyre case, stated the law as follows:

" 'As said by this court in the McIntyre case, it is the act which causes the injury and not the rank of the vice-principal, which determines whether the two employees are fellow-servants. A fellow-servant in some respects of his employment may be a vice-principal rendering the employer liable for his negligent acts, while at other times in his employment and in other acts he may be simply a fellow-servant of a person injured by his negligence, and his employer would not then be liable. The ruling in the McIntyre case turned entirely upon that distinction. In that case, which was like the present case in some of its aspects, the defendant's foreman, Kuhr, was driver of the defendant's wagon and had command of other employees, who assisted him in loading and unloading the wagon and accompanied it from the warehouse to the depot. The plaintiff was injured, not while loading or unloading and under the command and direction of Kuhr, but was injured in attempting to get aboard the wagon while on its way from the factory to the depot. The injury was caused by the sudden starting of the wagon by Kuhr, the driver. The court held that the negligent starting of the wagon by

Kuhr was an act performed in the capacity of fellow-servant, and was the sole cause of the injury.'

"In Wuellner v. Crescent Planing Mill Co., 303 Mo. 1. c. 47, 259 S. W. 764, the court stated the law in the following language:

" 'It is true that, if the negligent act of the foreman or vice-principal which injures the servant was not committed in performing some duty the master owed to the servant, but in doing an act of fellow-service, the master would not be liable. In other words, the doctrine of dual capacity prevails in this State. [Fogarty v. Transfer Co., 180 Mo. 490; Radtke v. Basket & Box Co., 229 Mo. 1. c. 23; McIntyre v. Tebbetts, 257 Mo. 117.]

" 'But, whether or not a given act done by the foreman was in discharge of a duty owed by the master to the servant, is a question for the court to decide. | Radtke v. Basket & Box Co., 229 Mo. 1. c. 24-5.']

"In Burge v. American Car & Foundry Co., 274 S. W. (Mo. App.) 1. c. 844, the court said:

" 'As we read the record, neither the plaintiff nor any other witness testifying stated that Hudgins gave any orders whatsoever in connection with the happening of the injury. Therefore, there can be no liability resulting from the giving of an improper order. Under plaintiff's version of the affair, he was directed to obey the orders of Hudgins. Then, of course, if Hudgins negligently gave orders resulting in the injury, the master could be held liable. If Hudgins turned on the power, as Laney said he did, such action did not involve superintendency control, but was an incident of the details of the manual labor which Hudgins was constantly doing, and which another fellow-servant could do, and was an act which would not render the master liable. This is true, even though it had been shown that Hudgins had given some other order which would constitute him a vice-principal. The dual capacity doctrine is well grounded in this State, and, under the facts of this record, plaintiff was injured through the negligence of a fellow-servant, and the master is not liable.'

"In State ex rel. Duvall v. Ellison, 283 Mo. 1. c. 541, 223 S. W. 651, Judge WALKER quoted with approval the following language of the Court of Appeals:

" 'It is true that a person may be a vice-principal of his master and also a fellow-servant of the one injured, and if the negligent act arises merely through the doing of the labor the two are performing in common, and not as a result of the exercise of authority over the co-laborer, then the negligence is that of a fellow-servant. It is the character of the act, and not alone the servant's rank, that determines the question of liability or non-liability.' "

In Bender v. Kroger Grocery & Baking Company, 310 Mo. 488, near foot of page 493, 276 S. W. 405, Judge BLAIR, after approving the ruling in Rowe v. Kroger Grocery & Baking Co., supra, thus. clarifies the situation:

"The act of Kuhr in directing McIntyre to perform an errand expressed the idea of his dominance over McIntyre. With the thought of that direction to McIntyre disassociated from Kuhr's particular act in starting the team, not the slightest difficulty is encountered in determining the status of the two men as fellow-servants at the time of the injury."

We think on the undisputed facts the injury to plaintiff complained of resulted directly from the negligent act of a fellow-servant, and that the demurrer of the Kroger Grocery & Baking Company to the evidence should have been sustained. The judgment as against the Kroger Grocery & Baking Company is reversed and, in view of the stipulation, the judgment against Rolla Wells, Receiver, is affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.