EBBIE PARKER v. NELSON GRAIN and MILLING COMPANY, Appellant. —48 S. W: (2d) 906.

Division Two, April 8, 1932.

*A. L. Berger* and *Morrison, Nugent, Wylder & Berger* for appellant.

*Woodruff & Gard* for respondent.

FITZSIMMONS, C.—This case presents questions of dual capacity and actionable negligence. Plaintiff suffered personal injuries by the act of another Wildbahn by name, who, plaintiff contends, was a vice-principal, but who, defendant argues, was at the time acting in the capacity of a fellow servant. At the close of plaintiff's case, defendant offered an instruction in the nature of a demurrer which the trial court marked "given" and was about to read to the jury. Thereupon plaintiff took a nonsuit with leave, and filed a timely motion to set aside the nonsuit, and for a new trial. The court sustained this motion and defendant appealed. The amount sued for fixes our jurisdiction.

At the time complained of, defendant was in the grain and milling business in Kansas City and had its operating plant there. Plaintiff was in the service of defendant as its stationary engineer, in charge of the engine room and boiler room at the plant. On the day of the injury, Mr. Wildbahn entered the engine room, having in hand a tool called a car mover, upon which he had been working and he asked plaintiff for assistance in putting it in condition. As its name implies, the car mover was used in moving freight cars by hand about the premises of defendant's plant. It was constructed on the principle of the lever, with a wooden handle which, when raised up and down, caused a metal plate, called the shoe and made to slide along a rail, to pry under and push forward the wheels of a railroad car. On the under side of the plate and running parallel and close to the railroad rail were two grooves or slots. Into each groove was set a piece of steel about two inches long and of oblong shape. These pieces of steel were called knives, and they were held in place by a bolted plate. From time to time the sides and edges of the

knives coming in contact with the rails became worn with use, and then the knives were taken out of the grooves and were put back, but with the unused edges toward the rails. In answer to a question as to how he received his injury, plaintiff testified:

"Mr. Wildbahn came in with a car mover, and was trying to get the bolt out of the plate. The bolt would turn when he tried to turn the nut. He came in the plant with the car mover for assistance. I asked him if he had another bolt. He said he did. So I just took a chisel and cut the bolt. When I got the bolt off I found that the slot that the knife sits in had been battered. It was rather soft, malleable iron and I took a hammer and beat that back, and then I took the chisel to smooth it up. I was on the concrete floor, and I raised up. I had the knife, and I went to slip it in the slot. It went about half way in, but it wouldn't go all the way. I was going to smooth it more so that it would go in, and Mr. Wildbahn picked it up, and took the hammer and gave it a lick, and a piece flew in my eye. That is the nearest explanation I can give."

On cross-examination plaintiff further testified concerning the accident.

"Q. How did it happen that you got up from the floor and Mr. Wildbahn started in? A. I thought I had it smooth enough so that the knife would slip in. I raised up to try the knife to see if it would go in. While I was fooling with it Mr. Wildbahn reached over and took it from me.

"Q. You were both standing up? A. Yes, sir.

"Q. And you handed it to Mr. Wildbahn? A. No, he reached over and took it.

"Q. You had been working on it, and Mr. Wildbahn reached over and took it? A. Yes, sir.

"Q. Where did the hammer come from? A. I think the hammer was laying on a little bench there that we used for a chair."

Plaintiff stated that the knife which Mr. Wildbahn struck with the hammer was a highly tempered piece of steel. On cross-examination he likened a hard piece of steel, such as was the knife, to glass.

Philip E. Deerr, a foreman in defendant's plant at the time of the injury complained of, testified on behalf of plaintiff that he entered the engine room by one door as Wildbahn entered by another, with the car mover. Deerr remained in the room and observed the work of repair. In answer to a question as to what he saw, Deerr testified:

"Q. Will you tell the jury what you saw? A. Mr. Wildbahn brought a car mover in the engine room and gave it to Mr. Parker to put in some new knives. Mr. Parker and Mr. Wildbahn were both working on the car mover. There was one blade in it that was battered. That is, the car mover had one blade in, and the other blade

was battered. When Mr. Parker went to put another blade in, it did not fit in the groove. Mr. Parker was on the floor trying to fix it so that a new blade would fit in. It would only go in part way."

After objections to Deerr's further statements had been passed on, he testified that he saw Wildbahn hit the knife with the hammer. On cross-examination Deerr was asked:

"Q. And Mr. Parker would chisel and hammer a while, and then Mr. Wildbahn would chisel and hammer? A. Yes, sir.

"Q. They were both working on the same job? A. Yes, they were working together."

Plaintiff and Deerr differed in this that plaintiff testified that after he was injured he went into the boiler room, and, when he returned later to the engine room, Wildbahn had departed with the car mover. Deerr on the other hand testified that plaintiff returned from the boiler room, and he and Wildbahn completed the task of putting the knife in its groove.

Plaintiff, in answer to a question, as to what Wildbahn did at the plant, answered: "He filled in around there, most any place they needed a man. He was our foreman—Superintendent of the plant." Wildbahn had employed plaintiff, who also testified that Wildbahn "appeared to have full charge over the men at the plant of directing the work." Foreman Deerr testified concerning Wildbahn's position as follows:

"A. Mr. Wildbahn was there about a year. It might have been longer.

"Q. Did he do any work in the office? A. Yes, sir.

"Q. Do you know what his official position with the company was? A. He was treasurer, or something like that; treasurer and manager.

"Q. Treasurer and manager? A. Yes, sir.

"Mr. Berger: I move that 'manager' be stricken out as being a conclusion of the witness.

"Mr. Woodruff: You said in your opening statement he was the manager.

"Mr. Berger: Then why take the time to talk about it in the presence of the jury.

"The Court: The motion to strike it out is overruled."

The part of the opening statement of defendant's counsel, to which plaintiff made reference, thus appears in plaintiff's additional ab stract of the record:

"Mr. Wildbahn, the manager—not one who sits behind a desk, but one who whips in and does work when he sees it is necessary—found that this car mover needed a new knife. He purchased a new knife, and attempted to replace it himself. He found he wasn't able to replace it himself, so he went to Mr. Parker, and the two o' them attempted to put it in."

Plaintiff offered testimony tending to prove the allegations of permanent impairment of the sight of his right eye, pain of body and anguish of mind, loss of earning, and medical and surgical expenses.

The negligence of defendant is thus alleged in plaintiff's petition.

"On or about the date aforesaid the manager of defendant company ordered plaintiff to help him insert new knives in the grooves, which it was found difficult to do because of their battered condition. Finding that one of the knives would go in the groove only part of the way, plaintiff attempted to smooth the battered sides of the apperture with the aid of a heavy chisel and hammer. As this procedure did not produce the desired result, defendant's manager inserted the end of the knife in the groove, took the hammer from the plaintiff, and although he knew or should have known, as a reasonable man, that to strike the knife, which is made of very hard, brittle metal, with a hammer would cause the knife to break or 'spall,' and although he knew that any chip or spall from the knife might strike the plaintiff, who was standing within close proximity to him, yet he suddenly and without warning, carelessly and negligently struck said knife a blow with the hammer, causing a chip of steel or spall to fly from the knife, striking plaintiff in the right eye, and cutting deeply into the eye-ball, grievously wounding and injuring plaintiff thereby."

Defendant's amended answer was a general denial, and pleas of contributory negligence, assumption of risk, and that the injuries if any, were due to the act of a fellow servant.

█ I. Defendant urges two reasons why this court should reverse the trial court's order sustaining plaintiff's motion to set aside the involuntary nonsuit and for a new trial. The first reason is that the dual capacity doctrine applies; that Wildbahn was a fellow servant of plaintiff in the work of the repair of the car mover and was not acting as a vice-principal, and therefore that plaintiff is not entitled to recover for any injuries which he may have suffered by the act of Wildbahn in striking the knife with the hammer. The master is not liable for injuries suffered by a servant through the negligent act of a fellow servant, except in the cases of railroad corporations as to their operating servants (Secs. 3275 to 3278, R. S. 1929), and of mine operators as to miners (Secs. 3282 to 3285, R. S. 1929), in which cases liability of the master for the acts of servants to fellow servants has been fixed by statute. Before railroad corporations were by statute excepted from the stated rule, fellow servants were thus defined in a railroad case (Relyea v. Kansas City, Fort Scott & Gulf Ry. Co., 112 Mo. 86, 20 S. W. 480, l. c. 481):

"They are coservants who are so related and associated in their work that they can observe and have an influence over each other's

conduct and report delinquencies to a common correcting power; and they are not coservants who are engaged in different and distinct departments of work.''

■ And it is worthy of note that this definition in substance has been adopted by the statutes relating to railroad corporations and mine operators. [Secs. 3277 and 3284, R. S. 1929.] The fellow-servant rule is an exception to the general rule that a master is responsible for injury caused to a third person by any negligence or misconduct of his servants while acting within the scope of their employment. [Funk v. Fulton Iron Works Co., 311 Mo. 77, 277 S. W. 566, 1. c. 569.] ■ And there may be a servant who acts for the master in a dual capacity. Tortious acts of such a servant raises the question whether at the time complained of he was acting as a fellow servant of the injured servant, or whether he was acting as a vice-principal. The dual capacity doctrine is thus stated in Funk v. Fulton Iron Works Co., 311 Mo. 77, 277 S. W. 1. c. 569:

''It frequently happens, however, that an employee is required by the terms of his employment: (1) To engage in a common service with his coemployees; and (2) to superintend in some measure the manner of doing the work. or perform some nondelegable duty of the master. In the event that a negligent act of such an employee causes injury to one of his coemployees the master's liability depends upon whether such act was attributable to his employment in the common service, or whether it was one of superintendence. But no such question can arise where the employee's sole duties are to superintend. In such case whatever he does within the scope of his employment he necessarily does as superintendent. And with respect to what he does as superintendent the maxim, 'Respondeat superior,' applies. These general principles are either expressly asserted in our many decisions touching the matter, or are plainly deducible therefrom.'' [Many authorities cited.]

■ Measured by the applicable rules thus stated, the evidence in this case warranted the trial court in setting aside the nonsuit and granting a new trial, if there was evidence tending to show negligence on the part of Wildbahn. There was no evidence whatever that Wildbahn was an employee who was required by the terms of his employment to engage in a common service with his coemployees. Wildbahn was treasurer and manager of the defendant company. As such he had continuous authority over plaintiff, absent any showing of other duties of his employment to engage in a common service with plaintiff. It is true that plaintiff testified that Mr. Wildbahn ''filled in around there, most any place they needed a man.'' But he added of Wildbahn: ''He was our foreman—Superintendent of the plant.'' And as defendant's counsel said in his opening statement to the jury, Mr. Wildbahn, the manager, was not one who sat behind a desk but one who chipped in and did work when he saw

it was necessary. So far as the evidence shows, the repair of car movers, tools used in the yards of the plant, was not part of the duties of plaintiff, the engineer, in charge of the engine and boilers. If a laborer, employed to load, unload and move freight cars, had entered the engine room and had requested plaintiff to repair the car mover it is at least questionable whether plaintiff would have stepped' aside from his duties as engineer and complied with the request. It certainly is highly probable that, if plaintiff had acted upon such a request, he would not have brooked interference or participation by the laborer in the work of repair. But Wildbahn's request to plaintiff to assist in repairing the car mover was the order of a superior, and plaintiff acted under that order. And while he worked, Mr. Deerr, the foreman, another superior, but of inferior rank, looked on as a spectator. The evidence clearly indicates that plaintiff did all the work, although Mr. Deerr testified in answer to leading questions that plaintiff and Parker were working together on the same job. But Wildbahn did not, by his acts, become a fellow servant of plaintiff. For, so far as the evidence discloses, he, the manager and superintendent of the plant, did not have, by the terms of his employment, a second or dual capacity by which he became a fellow servant at appropriate times and by certain conduct within the scope of his employment. And when Wildbahn picked up the car mover and seized a hammer from a workbench and struck the blow complained of, he was acting as a vice-principal.

 Defendant, however, insists that there is applicable here the rule stated in cases of dual capacity, that "it is the act and not the rank of the vice-principal that determines." He urges that Wildbahn was acting the part of a fellow servant of plaintiff and not the part of a vice-principal when he struck the blow with the hammer. But an examination of the cases discloses that the stated rule is not invoked or applied except where there is evidence tending to show that the person by whose act an injury was caused to a servant of a common master had what in law amounted to a double employment, one of supervision and authority over other servants and one of common service with these other servants. And when a question of the liability of the master arose in these cases, it turned upon the further question whether the act causing the injury was done by the man of dual capacity as a fellow servant of him who was hurt or was done as a vice-principal. Quite naturally the act itself determined in these cases in which capacity the doer of the negligent act was functioning at the time. In the leading case on dual capacity, Fogarty v. St. Louis Transfer Co., 180 Mo. 490, 79 S. W. 664, l. c. 668, this court, in words quoted by defendant in its brief, does not overlook the prerequisite of double duty stated. The court then said:

"So, likewise, there is no logical difference between a vice-principal himself doing an act within the scope of his duty as a co-serv-

ant, and his procuring some one else to do the act for him. As was aptly said in Bane v. Irwin, 172 Mo. l. c. 317, . . ., 'it is the act, and not the rank, of the vice-principal, which determines' whether he acts in the one or the other of his dual capacities, and which measures the master's liability.''

In the Fogarty case, it was held that the foreman of defendant was acting as a vice-principal and not as a fellow servant when he undertook to aid plaintiff, a teamster, in forcing an unwilling horse to back up. In the Bane case (quoted supra) this court held that a mine boss who under his employment sometimes worked side by side with the miners acted as a vice-principal in the matter which caused plaintiff's injury.

In the case of McIntyre v. Tebbetts, 257 Mo. 117, 165 S. W. 757, plaintiff, a servant of defendants, was injured while he was attempting to board a wagon of defendants which at the time had begun to move and was being driven by another servant of defendants named Kuhr. The Supreme Court en Banc adopted the majority opinion of the St. Louis Court of Appeals (140 Mo. App. 116, 120 S. W. 621) written by GOODE, J. In that opinion, as adopted by the Supreme Court, we read the following pertinent to the question here in issue (165 S. W. l. c. 759):

'' 'Kuhr was foreman of the wagon crew, and the other members were under his authority. The wagon was, so to speak, a detached place of operation where part of defendants' business was carried on under Kuhr's control. He was empowered to employ men for his crew, regulate their work, and let them go at his pleasure. . . . The main part of Kuhr's task was to drive the wagon and team. He did this, as well as control the hauling and giving orders to the men. Hence he discharged twofold functions, and the principal inquiry is whether the entire evidence proved he was acting as a common member of the wagon crew at the instant he drove forward and caused plaintiff's hurt or as vice-principal.' ''

Boston v. Kroger Grocery and Baking Co., 320 Mo. 408, 7 S. W. (2d) 1006, is similar in facts to the McIntyre case and alike in its illustration of double capacity when one employee is in fact vested with dual duties. It may be read with benefit because it summarizes many other cases. The cases mentioned are illustrative of the rule. The opinion of this court in Funk v. Fulton Iron Works Co., supra, does not change or modify the rule of double capacity. It only states it precisely and comprehensively.

■ II. But defendant further contends that plaintiff was not entitled to have the case submitted to the jury for the reason that no negligence on the part of Wildbahn was shown. Plaintiff on the other hand argues that under the evidence given by plaintiff, and which was the only evidence in the case, it was a question for the jury

whether negligence may be inferred from the act of Wildbahn in striking the knife of the car mover with a hammer and causing a particle of steel to fly into plaintiff's eye. This assignment of error calls for further scrutiny of the testimony given. We have stated in the narrative of facts that plaintiff testified that the knife which Wildbahn struck with the hammer "was a hard, highly tempered piece of steel," and he likened it to glass. He also testified that Wildbahn hit it "a good hard lick." On cross-examination plaintiff further testified:

"Q. If this (the knife) is as hard as glass, the least blow would chip a piece off, wouldn't it? A. Yes, you are likely to chip a piece off."

At the moment of the blow plaintiff and Wildbahn were standing side by side. The plaintiff saw a flash and smelled an odor and at the same instant something hit him in the eye. He further explained on cross-examination that, because the knife was of hard, highly tempered steel, a particle which a hammer might strike from it would be like a crumb of bread. On the other hand, the shoe, or flat part of the car mover, or a hammer or a chisel, each being of soft metal, would cast off slivers under the force of blows.

Whether in this case negligence was a submissible question is to be determined by the rule thus stated in 45 Corpus Juris, 1291:

"Where the facts are such that there is room for difference of opinion between reasonable men as to whether or not negligence should be inferred, the right to draw the inference is for the jury. The rule as usually and very generally stated is that any evidence at all from which an inference can reasonably be drawn that the defendant's conduct or the particular acts for which he is responsible and which proximately caused the plaintiff's injury constituted negligence is legally sufficient to take the case to the jury on that issue."

Pages of footnotes are taken up with citations of authorities from all American jurisdictions in support of this rule. Among the authorities cited are at least twenty Missouri cases, to which group reference is made. [45 C. J. p. 1292.]

Under the testimony given in this case on behalf of plaintiff, undisputed by any evidence put in by defendant, there is abundant room for a difference of opinion between reasonable men whether negligence may be inferred from the act of Wildbahn in striking with a hammer a good hard lick upon a hard highly tempered piece of steel, while plaintiff stood side by side with Wildbahn, the blow being followed instantly by a flash seen by plaintiff, an odor smelled by him and a sensation of something hitting him in the eye. The alternative holding would be that plaintiff here is not entitled to recover upon the evidence submitted under all favorable inferences which a plaintiff enjoys when a court is about to act upon a demurrer to

the evidence at the close of his case in chief. Under the law there is not room for a choice in this case between these two alternatives. Defendant cites cases in support of the proposition that unless a reasonable man could have reasonably anticipated, under the circumstances then existing that injury might follow from Wildbahn's act, there is no liability. We have examined the cases and do not find them in conflict with the quoted rule. Under the facts disclosed by the record before us it is for a jury to say whether there is or is not liability. The trial court did not err in setting aside the nonsuit and in granting to plaintiff a new trial. Its order to that effect therefore is affirmed and the cause is remanded for further proceedings. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur.