THEODORE WALL, Appellant, v. PHILIP A. ROHAN BOAT, BOILER & TANK COMPANY, a Corporation.—62 S. W. (2d) 764.

Division Two, August 12, 1933.

620

*Igoe, Carroll, Higgs & Keefe* for appellant.

622

*William F. Fahey* and *Thompson, Mitchell, Thompson & Young* for respondent.

COOLEY, C.—In the Circuit Court of the City of St. Louis the plaintiff obtained a $10,000 verdict against the defendant for personal injuries sustained while in defendant's employ. The trial court sustained defendant's motion for new trial and from that order plaintiff appealed. The court sustained said motion on the ground, stated of record, that it had erred in not sustaining defendant's demurrer to the evidence, offered at the close of the case, and this because, as appears from a memorandum filed by the court, the court concluded that the negligence causing plaintiff's injury was that of a fellow servant, for which the master was not liable. That question is the only debatable one so far as concerns submissibility of the case and the only one about which there is substantial controversy. That plaintiff's injury resulted from somebody's negligence is clearly shown and practically conceded and the evidence amply justifies the finding that he himself was not negligent. We need, therefore, state only the facts necessary to an understanding of that question.

. Plaintiff was a boiler maker's helper, employed by defendant along with some fifteen or twenty others, boiler makers and their helpers, caulkers, etc., in the erection of some tanks for another corporation, and was injured by the falling of a scaffold on which he worked.

There were ten tanks to be erected, each fifteen feet in diameter and to be, when completed, twenty-six or twenty-seven feet high. Each tank was built up by successive "rings" of metal, each ring being composed of a number of sheets of metal. The sheets forming a ring were placed in position and first bolted together and then riveted. When a ring was completed another ring would be erected upon it. Each ring was seven feet in height except the last or top one which was to be six feet. Work progressed on all ten tanks at the same time. First one ring of each tank was installed, then a second ring on each tank, and so on. The men worked in gangs of three or four. The bolting up, sometimes called fitting up or setting up gang, with which plaintiff worked, got the metal sheets, hoisted them into position with a derrick and bolted them together to form a ring. The riveters followed.

After the first ring of a tank had been constructed it was necessary for the men to have a scaffold from which to work on the next one. These scaffolds were constructed in this wise: Metal brackets, supplied by defendant, having one upright and one horizontal arm, were bolted to the side of the tank about eight feet apart and a plank was laid upon the horizontal arms of two brackets, the plank forming the platform upon which the workman stood. The horizontal arm of each bracket was about three feet long and was braced by a triangular metal plate fitted into the apex of the angle made by the arms of the bracket. This brace plate extended only about halfway from the perpendicular arm of the bracket bolted to the tank to the end of the horizontal arm, leaving that arm projecting unsupported some eighteen inches beyond the plate. Owing to the circular form of the tank and the distance apart of the supporting brackets the plank forming the platform had to and did rest upon the outer unbraced part of the horizontal bracket arm. Plaintiff, working about one of the tanks in the line of his duty, was upon such a platform or scaffold, fourteen or fifteen feet above the concrete foundation, when the horizontal arm of the bracket projecting beyond the brace plate and supporting the platform bent and gave way, causing him to fall to the concrete beneath.

Plaintiff's evidence tended to show that the bracket arm was pitted and corroded and was too weak to support the weight it was designed to bear; also, that it was customary and in order to insure safety was necessary for a bracket arm of that kind so used to have a brace attached to or near the end of the horizontal arm. Such brace would have prevented the arm from bending as it did. That the bracket which gave way, causing plaintiff's fall and injury, was defective is not seriously disputed. The controversy is as to where responsibility for its use in the scaffold lies.

Plaintiff was injured on September 28, 1922, about ten o'clock in the morning. He testified that he had been employed by defend-

ant about nine days before; the tanks had been begun and were a ring or two high when he 'was employed; the scaffold that fell had not then been constructed; that James Owens was defendant's foreman in charge of the workmen and directing the work; that on the morning of his injury Owens directed him to get the necessary metal sheets from the ground, hoist them into position and bolt them to the tank, two rings of which had been constructed; that the scaffold in question was then in place and complete, having been constructed some time previously; that he did not assist in or have anything to do with its construction nor did he inspect it; he did not see it in process of construction; it was necessary for him to go upon the scaffold in order to do the work Owens directed him to do; Owens was near by and saw him go upon the board supported by the defective bracket and saw him fall. Asked on cross-examination about the duties of the bolting up gang and about how and by whom the scaffolds used in the work were constructed, he said the bolting up men brought the metal sheets there, hoisted them to position with a derrick, and "bolted them up" on the tanks; three to five men worked in that gang, the number varying; sometimes Owens would take one of them away temporarily for other work; the personnel of the gang changed from time to time; the foreman (Owens) usually erected the scaffolds; he helped put them up; he supervised their construction and was supposed to see that they were up right.

"Q. But of course it was the bolting up gang that put the scaffold up, wasn't it? A. Yes.

"Q. That was the gang you were working in? A. Well, he might put any one putting them up. Take one or two men out of the gang.

"Q. But it was the bolting up gang that put the scaffold up? A. The biggest part of them.

"Q. That was the gang you belong to? A. I worked in that gang.

"Q. And that was your gang then that put up the scaffold? A. They put some of it up; yes, they worked.

"Q. Some one in your gang put it up? A. There may be one or two."

He further testified he had never assisted in any way in constructing any of the scaffolds and was not sure whether "his gang" put them up.

"Q. You will say it was the duty of your gang to put up the brackets? A. They were to put up the boards or stuff; I guess they did.

"Q. It was the duty of the setting up gang to put them up? A. Well, they had a man or two to help put them up."

On re-direct examination he testified that Owens would get one or two men out of the gang to put up 'the brackets and scaffolds, selecting "whoever he came to first, I suppose;" that so far as he knew no particular men or gang of men regularly put up the brackets; he did

not know who had put up the scaffold that fell with him. He further testified that Owens supervised the construction of scaffolds; "he did some of the work too. He would always be doing something there;" that he was "in charge of the whole construction."

Ed Scheer, for plaintiff, testified that he was a boiler maker, working for defendant at the time in question; that the scaffold in question had been up about a day before plaintiff's injury, but he did not know who had put it up; that Owens superintended the work of putting up scaffolds; he would get the setting up gang to help with the construction.

"Q. Do you know the practice followed, who picked out the men to put up the scaffolds? A. Mr. Owens told them what to do.

"Q. (On cross-examination) There is no doubt about the fact that it was the setting up gang that put up all the scaffolds? A. No, not all of them; sometimes the riveting up gang would move their own scaffolds at times."

Henry Hoffman, for plaintiff, testified that about a half hour before plaintiff's injury he happened to be talking with Owens and called the latter's attention to the bracket which later gave way, telling him: "That bracket don't look right. It is not much good, I don't believe." In reply Owens said something about it being all right.

On behalf of defendant, Owens testified that he was in charge of the work for defendant; that he divided his men into gangs, having a gang of four fitters up (the bolting up gang), about five gangs of riveters of three each, and two caulkers; that after the first ring of a tank was installed it was necessary to have a scaffold for the men to work from on the higher rings; that under the "system of construction" followed in the work "the fitters up put up their brackets and scaffolds . . ."

"Q. Tell us who were in this fitting gang on the 28th of September? A. I think Shaw, he was in charge of it; I had charge of the job and I told Herb Shaw to take the three men and do the fitting up. He had himself Shaw, Scheer, Hoffman and Todd Wall (plaintiff) in the gang."

Owens said these men had been working together for probably a week before the accident; that the fitting up gang put up the scaffold which fell. Later he said he took Scheer in the gang that morning, in place of a man who had failed to show up, Scheer having previously been in a riveting gang. He testified that he himself had nothing to do with putting up the scaffold which fell. "I was foreman of the job but I didn't have to do any work. I was not supposed to do any work."

"Q. You didn't even supervise it? A. No, I turned it over to the fitting up gang; they put all the brackets and boards up."

On cross-examination he testified he turned over the supervision

of that particular work to Shaw; "I gave him charge of it; he had charge of the fitting up gang who bolts the rings and puts up scaffolds." He said that he himself did not supervise the erection of scaffolds. "I just tell my men to put it up, that's all."

"Q. You didn't look at them after they were up to see if they were safe? A. I looked at them sure." But, he said, he had not looked at this one; he thought it was the first time he had missed seeing one, and he denied that Hoffman had called his attention to it. He testified that if he found anything the matter with a scaffold he would order the men to take it down; that he inspected them to see if they were put up properly; "that's what I was put there for;" "I was there to run the job."

"Q. Did you select the men to put up the brackets? A. Yes.

"Q. You picked them out and told them to go ahead and do the work? A. Yes."

Herbert Shaw testified that he and the plaintiff and Hoffman and Scheer put up the scaffold in question, selecting the brackets from a pile provided by defendant on the premises but his testimony is not clear as to whether he individually or "the gang" made the selection.

"Q. You say you put up these brackets? A. Yes.

"Q. You were foreman of the gang? A. I would do just what Owens told me.

"Q. Did he tell you to take charge of the gang? A. He said it, yes.

"Q. Did he tell you that? A. Not exactly. He had charge of the whole works. He gave me that work to do."

Shaw further said that Owens told him to take charge of the gang and that it was his job to see that the work was done right; that he looked at the brackets put up by the gang to see that they were put up right and examined them to see that they were in good condition; that in constructing scaffolds he worked with the men composing the gang; that the same men who put up the brackets put the boards on them.

Respondent argues that the bolting up gang, of which plaintiff was a member, was charged with the duty of erecting the scaffolds on which to work, that members of that gang did erect the scaffold in question, and that the construction thereof was therefore the act of plaintiff's fellow servants, for which the defendant is not responsible. The learned circuit court seemingly came to the conclusion that the evidence conclusively so showed, relying upon Guthrie v. Gillespie, 319 Mo. 1137, 6 S. W. (2d) 886; Williams v. Ransom, 234 Mo. 55, 136 S. W. 349, and Forbes v. Dunnavant, 198 Mo. 193, 95 S. W. 934. Those cases are respondent's chief reliance here. In our opinion they are clearly distinguishable from the instant case on the facts and do not justify such conclusion.

■■ The statute, Section 13238, Revised Statutes 1929 (7 Mo.

Stat. Ann. p. 4797), requires that all scaffolds or structures used in the erection of any building shall be well and safely supported and so secured as to insure the safety of persons working thereon. We think the statute applies to structures such as these tanks. [See Brackett v. James Black, etc., Constr. Co., 326 Mo. 387, 32 S. W. (2d) 288.] But regardless of that statute it is the duty of the master to use ordinary care to furnish his servant a reasonably safe place in which to work, which duty cannot be delegated to another servant so as to relieve the master from liability for the negligent performance by such servant of an act constituting part of such duty of the master. [Bender v. Kroger Grocery & Banking Co., 310 Mo. 488, 276 S. W. 405, and cases cited; Propulonris v. Goebel Constr. Co., 279 Mo. 358, 213 S. W. 792.] The same rule applies with respect to appliances furnished by the master. [Warner v. Oriel Glass Co., 319 Mo. 1196, 8 S. W. (2d) 846.] The duty as to furnishing a reasonably safe working place is a continuing duty. [Bender case, supra; Koerner v. St. Louis Car Co., 209 Mo. 141, 107 S. W. 481.]

And where workmen are working together as fellow servants and the master detaches one from such work and uses him to construct a working place and through his negligence such working place is made unsafe, and one who is ordinarily a fellow servant but had nothing to do with constructing such working place is injured because of such negligent construction, the fellow servant doctrine does not apply. In such case the servant thus detached from his usual work and used in constructing a working place for others is not, while so engaged, the fellow servant of such others, so as to absolve the master from liability to an employee suffering injury through his negligence, even though generally he and the injured employee may be fellow servants. [Propulonris v. Goebel Constr. Co., supra; Zellars v. Missouri Water & Light Co., 92 Mo. App. 107 (on motion for rehearing); Adair v. K. C. Term. Ry. Co., 282 Mo. 133, 220 S. W. 920; Combs v. Rountree Constr. Co., 205 Mo. 367, 104 S. W. 77; Raines v. Tetley-Klein Lbr. Co., 149 Mo. App. 576, 129 S. W. 742; White v. Montgomery Ward & Co., 191 Mo. App. 268, 177 S. W. 1089; Johnson v. Corn Products Ref. Co., 319 Mo. 958, 6 S. W. (2d) 568.]

However, while the above stated propositions are well settled, it is also held that the defense of fellow servant is available against co-employees responsible for the construction of a working place, such as a scaffold, despite the statute above referred to. [Guthrie v. Gillespie, supra; Williams v. Ransom, supra; Forbes v. Dunnavant, supra.] The question here is, does the evidence, viewed in the light most favorable to plaintiff, as it must be in determining a demurrer, bring the case within the latter rule? We think not.

Plaintiff had nothing to do with the erection of the scaffold which fell. It had been constructed by others and was a completed struc-

ture when he was directed by the foreman to go to work upon it. He had not participated in the construction of any other scaffolds used in the work. He did not even know who had built this one. His evidence tends to show that the bolting up gang as a whole did not regularly put up the scaffolds and that when members thereof did such work it was by the selection and under the orders and supervision of defendant's foreman, different men being detached for such work at different times. In fact, plaintiff's evidence tends to show that the bolting up gang did not construct the scaffold in question. Owens testified that he ordered Shaw to "take the three men" and do that work. Shaw said that in obedience to that order he took plaintiff, Scheer and Hoffman who, with himself, did the work. But plaintiff testified he did not help. Scheer in effect said he did not, for he said he did not know who constructed the scaffold. And Hoffman's testimony amounts to a denial of participation. The latter was not asked directly if he helped. But he said he had noticed the defective bracket "in passing." These questions and answers followed:

"Q. What gang were you a member of? A. I wasn't in no gang at all.

"Q. What were you doing? A. Helping unload trucks and carrying water to the men and moving the derrick around to hoist the rings.

"Q. You weren't a member of the setting up gang at all? A. No—well, I helped a little.

"Q. You were not a member of the setting up gang when the accident happened? A. No."

That was the extent of Hoffman's testimony on that subject. It is at least a permissible inference that he did not assist in the construction of this scaffold. Who, then, did that work? Admittedly Shaw, appointed thereto by Owens, defendant's general foreman or superintendent and representative, selected certain men and had them do the work. He said those men were the plaintiff Wall, Scheer and Hoffman. But he was defendant's witness and his testimony was not binding on plaintiff. Its credibility was a jury question. If, as the jury may have believed under the evidence, Shaw took men other than members of the bolting up gang to erect the scaffold, how can it be said that they, in doing that work, were plaintiff's fellow servants? Even if the men who did the work were members of the bolting up gang other than plaintiff, but were specially selected and appointed by defendant's foreman to construct the scaffold, under the direction and supervision of such foreman or a man appointed by him to direct them and have charge of such work, as may have been found under the evidence, including that of defendant, the plaintiff having no part in or knowledge thereof, the men so con-

structing the scaffold would not be fellow servants of plaintiff in the doing of that work.

In Koerner v. St. Louis Car Co., 209 Mo. l. c. 159, 107 S. W. 481, the court said, quoting from Dayharsh v. Railroad, 103 Mo. l. c. 575:

"A person employed to perform any of the master's duties towards his servant is, while that relation continues and in respect to such duties, no fellow servant of the latter. The duties which the master owes a servant may, in many particulars be delegated to subordinates, and the wide extent of modern business enterprises often necessitates so doing; but that delegation of authority does not relieve the master from a proper discharge of those duties." Other quotations to like effect are found in the opinion.

In Propulonris v. Goebel Constr. Co., 279 Mo. l. c. 369, 213 S. W. 792, it is said:

"The test of the relation (fellow servant) as laid down is: Was the employee injured and the one inflicting the jury so associated in their work that each could observe and influence the other's conduct and report any delinquency to a correcting power, or head?" [Citing Koerner v. Car Co., supra, and other cases.]

This definition of who are fellow servants was quoted with approval in Guthrie v. Gillespie, supra. Judged by that test plaintiff was not the fellow servant of the men who constructed the scaffold. He had no opportunity to observe their work in constructing it and knew nothing about it. The scaffold had been constructed by others selected by and under the direction and supervision of defendant's foreman or the man appointed by him to have charge of that work, and it was a completed structure when plaintiff was directed by the foreman to work upon it.

In Raines v. Tetley-Klein Lumber Co., supra, the plaintiff and three fellow workmen had constructed a scaffold for their use in nailing sheet tin on a building. They had assumed to erect their own scaffold and were fellow servants in the work they were doing. While the plaintiff was engaged elsewhere a vice-principal of the defendant master ordered work done which necessitated taking down part of the scaffold. Such work being completed, that part of the scaffold was replaced under the supervision of the vice-principal by a fellow employee of plaintiff named Day. Day did the work of replacement negligently and plaintiff, working on that part of the scaffold, was injured as a result of such negligence. The master claimed Day was plaintiff's fellow servant. The master was held liable, the court saying, 149 Mo. App. l. c. 583, 129 S. W. 742:

". . . Defendant undertook to provide this particular piece of scaffolding as an appliance or place for the carpenters to use while engaged in their task; therefore is responsible for the negligence of Day in building it, no matter if, generally speaking, he was a co-servant of plaintiff. It was furnished as a completed

appliance for the use of plaintiff, and, if negligence occurred in erecting it, defendant was responsible for any injury thereby caused.''

For other cases applying the principle that where one, ordinarily a fellow servant of an injured employee, has been detached by the master and used in making or repairing a working place, and injury results through his negligence, the master is not absolved under the fellow servant doctrine, see White v. Montgomery Ward & Co., supra; Combs v. Rountree Constr. Co., supra; Adair v. K. C. Term. Ry. Co., supra; Zellars v. Mo. Water & Light Co., supra. And where the injury results from the concurrent negligence of a fellow workman and the master's *alter ego* the master is held liable. [Amis v. Standard Oil Co. (Mo.), 233 S. W. 195; McNulty v. Atlas Portland Cement Co. (Mo. App.), 249 S. W. 730, 734.]

Forbes v. Dunnavant, Williams v. Ransom and Guthrie v. Gillespie, supra, and other cases cited by respondent hold that employees working together at a common task may by contract, express or implied, engage to erect their own scaffolds, etc., needed in doing their work and if they assume and undertake to perform that duty and do it negligently, whereby one of them is injured, the fellow servant defense is available to the master. In such case the master has not undertaken to provide the working place. But those cases do not question the well settled rules above discussed relative to the master's duty where the injured servant has not so assumed responsibility for his working place. As stated above they are not analogous in their facts to the instant case. We shall not take space to analyze them. In our opinion they clearly do not support respondent's contention.

It is further contended by appellant that the fact, shown by plaintiff's evidence, that before plaintiff was directed by Owens to do the work requiring him to go upon the scaffold, the defective bracket was pointed out to Owens and by him approved, takes the fellow servant defense out of the case even if it would otherwise be available to defendant. In 4 Labatt's Master and Servant (2 Ed.), page 4038, section 1402, it is said:

''In some cases in which the (fellow servant) doctrine was declared to be a bar to the action, the fact is adverted to that the master had no knowledge of the risks created by the co-servant's negligence; and it is evident that this ignorance, whether explicitly mentioned or not, is always an implied condition to the availability of the defense. . . . On the other hand, the omission of the master to remedy the abnormal conditions or see that the servant was not, without his knowledge, exposed to them, constitutes an independent breach of duty on his part which, upon general principles, renders him personally liable, quite irrespective of the facts that the original cause of the dangerous conditions was the act of a co-servant.'' [See also same volume, p. 4476, sec. 1498.]

We think there is merit in this contention but we shall not further discuss the point because we are convinced that under the evidence it cannot be said as a matter of law that the negligence which caused plaintiff's injury was that of a fellow servant and not that of the master. For the same reason we do not discuss other grounds on which appellant claims the court's conclusion as to the sufficiency of the evidence is wrong. There is ample evidence to justify the finding that the master is responsible. The learned circuit court erred in sustaining the motion for new trial on the ground stated, that the demurrer to the evidence should have been sustained.

Respondent urges that if the order sustaining the motion for new trial cannot stand on the ground stated in the order, viz., the insufficiency of the evidence to make a submissible case, it may be sustained on one or both of two other grounds preserved in the motion, viz., the court's refusal of Instruction D requested by defendant, and the giving of plaintiff's Instruction No. 2. Defendant's Instruction D, which the court refused to give, reads:

"The court instructs you that if you find and believe from the evidence that immediately preceding the accident the plaintiff was a member of a gang whose duty it was to erect the scaffold which fell, and that at the time that said scaffold was erected, the defendant had on the premises, available for use by plaintiff and his gang, brackets of sufficient strength to support a scaffold under the weight reasonably to be expected to be placed upon it during the course of the work at the Waltke Soap Company, and that the plaintiff or one or more members of his gang, or the plaintiff co-operating with one or more members of his gang, erected the scaffold, you shall find for the defendant even though you may believe that plaintiff or any other member of his gang were careless in the manner in which they erected the scaffold, or the material which they used (if you find they did erect the scaffold), unless you shall find that the witness Jim Owens actually assisted in the erection of the scaffold that fell."

The above instruction was properly refused. To mention one sufficient reason, it directs a verdict for the defendant if the jury finds that plaintiff "*or* one or more members of his gang," erected the scaffold, etc., unless the jury finds that Owens "actually assisted in the erection of the scaffold that fell." It wholly ignores the evidence tending to show and authorizing the finding that certain members of the bolting up gang, other than plaintiff, which gang the jury would naturally understand was meant by the words "his gang," may have been specially selected and appointed by defendant to construct the scaffold under the supervision of the defendant's representative, and the legal effect thereof as hereinabove pointed out. It would require a finding for defendant, although the jury might believe from the evidence that neither plaintiff nor such member or

members of "his gang" had assumed the duty of constructing this scaffold, but that defendant had selected one or more of them and without plaintiff's participation or knowledge had had them construct it under the direct orders and supervision of its own *alter ego*. The proviso, "unless you shall find that the witness Jim Owens actually assisted in the erection of the scaffold that fell," does not help the patent error above pointed out. From what we have said above it is apparent that it was not at all necessary in order to make defendant liable that Owens should have actually assisted in the construction of the scaffold which fell. So far as concerns the question of the master's legal responsibility, it is immaterial whether he or his vice-principal personally does the actual work of constructing a working place for his servant or whether he employs some one else to do it. Without considering other objections urged by appellant to Instruction D it is clear that the court did not err in refusing it and therefore its refusal cannot constitute ground for granting defendant a new trial.

█ Instruction No. 2 was plaintiff's principal instruction. Respondent complains of only the first part of it, reading:

"The court instructs the jury that if you believe from the evidence that while plaintiff was in the employ of the defendant, in September of 1922, he was required, in the course of his duties as such employee, to be upon the scaffold mentioned in the evidence and that said scaffold was then and there maintained by the defendant for plaintiff's use (if you so find) then it was the duty of defendant to exer-* cise ordinary care to the end that said scaffold be maintained in a reasonably safe condition for such use. . . ."

We are not sure we understand respondent's criticism of this instruction. The contention seems to be that it erroneously submits the question of whether or not the scaffold had been erected before plaintiff was employed, while his own evidence as well as that of defendant shows that when he was employed the scaffold had not yet been constructed; and further, that it is misleading because of the use therein of the word "maintained." As to the first objection it is clear that the instruction refers to the time when plaintiff was required in the course of his duties to be upon the scaffold. As to the second, respondent urges that the only question was whether the scaffold had been *erected* by fellow servants or by the master, and that the words "maintained in a reasonably safe condition" do not present that issue; that there was no question of *maintenance* in the case; and that the instruction was therefore misleading. Subsequent portions of the instruction, hypothecating the facts to be found in order to authorize a verdict for plaintiff, show that the word "maintained" was used rather in the sense of provided. And if defendant erected or provided the scaffold for plaintiff's use it owed him the duty to use ordinary care to see that it was in reason-

ably safe condition when he was required in the course of his duties to use it. The instruction as a whole fairly submits the issues as made by plaintiff's evidence and is not misleading. The court did not err in giving it.

We think the learned circuit court erred in sustaining defendant's motion for new trial. Its order sustaining said motion is therefore reversed and the cause is remanded to that court with directions to set aside said order and to reinstate the verdict and enter judgment thereon as of the date of the verdict. *Westhues* and *Fitzsimmons, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.