SAM RICHARDSON, EMPLOYEE, RESPONDENT, v. CONSOLIDATED PRODUCTS COMPANY, EMPLOYER, TRAVELERS INSURANCE COMPANY, INSURER, APPELLANTS.—183 S. W. (2d) 393.

St. Louis Court of Appeals. Opinion filed November 14, 1944.

1120

*Jones, Hocker, Gladney & Grand* and *Orville Richardson* for appellants.

*Albert I. Graff* and *Ben Tepper* for respondent.

HUGHES, P. J.—The appeal is by the employer and its insurer from a judgment of the Circuit Court of the City of St. Louis affirming a final award of the Workmen's Compensation Commission in favor of the employee. The employee, Sam Richardson, was totally and permanently disabled as the result of injuries sustained when a steam boiler exploded. The accident ocurred at about 12:30 A. M. on Monday, September 1, 1941. Richardson had been working for the employer since the year 1934, or for about seven years. The business of the employer, Consolidated Products Company, was that of processing buttermilk into poultry and animal food by condensing the buttermilk and adding vitamins thereto. The buttermilk was purchased from creameries and dairies, and was condensed and dried in receptacles heated by steam pipes from a boiler. While Richardson had worked continuously throughout the year preceding his injuries, he was not a regular full time employee. His duties required him to arrive at his employer's plant an hour or an hour and a half before the other employees, and to place and maintain fire beneath the boiler and have sufficient steam pressure for the plant to begin operation when the other employees arrived, after which time another employee, who had charge of the condensing and drying receptacles, would "fire the boiler" during the day's operation of the plant. In addition to getting up steam in the boiler, and after the other employees had arrived, Richardson would perform such other tasks as were assigned to him, such as loading or unloading railroad cars and trucks, or cleaning about the plant, after which he would leave for the day. He would raise steam in the boiler every morning and had occasionally fired the boiler all day. Sometimes he was called

for emergency work after he had gone home. His wages were thirty cents per hour plus time and a half for the time he worked exceeding forty hours in one week. The pay roll week began on Sunday and extended to and including the following Saturday. During the year preceding his injuries, Richardson worked fifty-one weeks and averaged 16.37 hours a week, and his pay averaged $5.08 per week. For the pay roll week beginning Sunday, August 24, 1941, and ending Saturday, August 30, 1941, Richardson worked 65.5 hours, making his wages for that week, at thirty cents an hour and time and a half for hours over forty, $23.48. The reason that Richardson's hours and consequently his wages for that week were far above his average hours and wages for the year grew out of the following facts: The operation of the condenser and drier required the services of an experienced man, and Owen Ruffin was the employee in charge of that work. Each morning Richardson would fire the boiler and raise the required steam pressure before Ruffin came to work, which was usually about six or seven o'clock in the morning, and when Ruffin would arrive he would take charge of the condenser and drier, and would continue to fire the boiler throughout the day while Richardson would do such other work about the plant as was assigned to him, or if there was no other work for him to do he would go home. On Monday, August 25, 1941, Richardson went to work at 5 A. M., the usual hour, and got up steam in the boiler. At about 6:30 A. M. Ruffin came to the plant and complained of a sprained back and told Richardson that he was not able to fire the boiler and would have to go home, and that if Richardson wanted to he could talk to Mr. Rolfsmeyer, the plant manager, and probably get to work on the boiler. Richardson went to Mr. Rolfsmeyer and told him he had work for that week on a W. P. A. project and unless he worked on that project that day he could not work on it during the week, and said he would do Ruffin's work of firing the boiler if he was given a full week's work, and Rolfsmeyer agreed to give Richardson full time work for the week ending August 30, 1941, even if Ruffin was able to come back during the week. Ruffin was able to be back at his work of attending the condenser and drier the next day, and toward the end of the week was able to attend to his full duties; however, under the arrangement made Richardson continued to fire the boiler during the week.

The plant did not operate on Sunday, August 31, 1941, but would have to be operated on Monday, September 1, 1941, in order to process buttermilk that would then be on hand. Inasmuch as Monday, September 1, 1941, was Labor Day, and the employees desired to take off from work for at least a part of the day, and following the past practice as to operation of the plant on holidays, it was arranged that Richardson would have steam up in the boiler by 1 A. M. Monday, September 1, 1941, at which time Ruffin and the other employees would

begin operations and work until 7 A. M. when the plant would close for the day, and resume regular hours of operation the next day. Richardson began to fire the boiler about 11 P. M., Sunday, August 31, 1941, and the boiler exploded about 12:30 on the morning of September 1, 1941, before Ruffin had arrived. Richardson was not going to do any further work on Monday after firing the boiler, and said that he expected beginning on that Monday to go back to his old job.

On these facts which were not disputed the Commission made a final award in claimant's favor and against the employer and insurer, for permanent total disability in the sum of $15.08 per week for 300 weeks, and thereafter the sum of $6 per week for life. The findings of fact and conclusions of law filed by the Commission contain the following statement:

"We further find that the employee's grade of employment changed on August 25, 1941; that during that week employee earned $23.48, his average daily wage was $3.91 2/3 and his yearly earnings would be $3.91 2/3 times 300, which we find to be the number of days the plant operated per year, or $1175.00, average annual earnings, divided by 52 equals $22.60, average weekly earnings, times 2/3 equals $15.07, compensation rate."

In these cases the method for computing compensation is provided by Section 3710, Revised Statutes 1939, Revised Statutes Annotated, section 3710, which, in so far as applicable here, requires that (a) the compensation shall be computed on the basis of the annual earnings which the injured person received as salary, wages, or earnings if in the employment of the same employer continuously during the year next preceding the injury, and (b) employment by the same employer shall be taken to mean employment by the same employer in the grade in which the employee was employed at the time of the accident uninterrupted by absence from work due to illness or any other unavoidable cause, and (d) as to employees in employments in which it is the custom to operate throughout the working days of the year, the annual earnings, if not otherwise determinable shall be regarded as 300 times the average daily earnings in such computation.

Appellants' complaint is that the Commission acted without or in excess of its powers, and without sufficient substantial evidence, in holding (1) that the grade of employment of Richardson changed on August 25, 1941, and further, (2) that even if the grade changed on August 25, it was changed back to the former grade on or before September 1, the date of the employee's injuries, and also, (3) that even if the grade changed on August 25, and was not changed back on or before September 1, it was a temporary grade and the employee's earnings from the work usually, regularly, and principally done rather than merely temporary work should control the compensation rate.

The purpose of the Workmen's Compensation Law is to ameliorate, in the interest of the workman and public welfare, losses sustained by the workman and his dependents from accidental injuries received by the workman in the proper course of his work. It is to compensate to the extent that the law provides for the loss of earning power of the workman in the future occasioned by the injuries. It was never contemplated that the injured employee be compensated on a basis of pay far exceeding the earning ability of the workman. And the law very wisely provides a rule for ascertaining the extent of future loss to the workman which is based upon the record that the workman himself had established before meeting with his misfortune; and so one workman who is proven to have a greater earning power in the past is entitled to and is given greater compensation than one of less earning power. No other rule would be fair and just to either the employer or the employee. The law recognizes that where the employment has been continuous during the preceding year, the grade of employment may not have been continuous; the employee's earning ability may have increased or diminished during the year by either a promotion or a demotion, or a change in the character of work and pay, and so while paragraph (a) of Section 3710 provides that the compensation shall be computed on the basis of the annual earnings in case the employment had been by the same employer and continuous during the preceding year, this is qualified or explained by paragraph (b) which says that employment by the same employer shall be taken to mean employment by the same employer in the grade in which the employee was employed at the time of the accident. And what is meant by the "grade" in which the employee was employed?

In the case of Mossman v. Chicago & Southern Air Lines, 236 Mo. App. 282, 153 S. W. (2d) 799, this court held that where deceased had been employed by the air line company as a first pilot, but had been demoted to a reserve pilot, which position called for working as both a first pilot and co-pilot, that such changes amounted to a reduction both as to rank and wages, and amounted to a change of "grade" of employment. In that case the evidence disclosed that pilots employed by the air line company fell under one of three classifications, i. e., a first pilot who was in charge of the ship and gave orders to the co-pilot, and had full responsibility for the ship; the co-pilot assisted the first pilot; the reserve pilot's duties were to relieve either the first pilot or a co-pilot as the occasion might require. Not only were there these differences in the rank and character of work, but the wages were entirely different; the pilot being paid for the number of hours in the air and the mileage flown, while the co-pilot was paid a salary of $225 a month, and the reserve received a first pilot's pay while working as such or a reserve pilot's pay while so working. It is apparent that the facts in that case are in nowise

analogous to the facts in this case. However, we did say one thing in the Mossman case that is very appropriate to repeat here and that is, "We must assume that the Legislature used the word 'grade' in Section 3320 (b) in its plain, ordinary meaning. The word 'grade' is ordinarily used to denote quality, value, relative position, rank, or standing." Now applying that definition to the facts in this case: Was the work of continuing during the day to fire the boiler of different quality than firing the boiler of a morning before Ruffin took it over? Clearly not. Was his work of any different value? No, he was there to fire the boiler of a morning and do such other work as was assigned to him, and his pay was and continued to be thirty cents per hour. His relative position was not changed; he continued to be what might well be termed a general utility man, to fire the boiler and do any other work assigned to him. His rank or standing was not changed in the least. He never assumed the duties or the rank or standing of Ruffin, because he was incapable of attending to the condenser or drier. We are unable to see that Richardson's "grade" was changed in the least by his temporarily putting in a full day or week in keeping up steam in the boiler instead of getting up the steam and then doing other tasks assigned to him. The mere temporary increase in wages because of longer hours was not a change in class or rank or order of the employee. [Buckley v. Elmira Coal Co. (Mo. App.), 104 S. W. (2d) 725.] In the case of Lamker v. Schiller (Mo. App.), 166 S. W. (2d) 246, the Commission accepted the wages for the day the employee was injured as a basis for the computation, instead of taking the average of twenty-two days that the employee had worked at similar work during the preceding year, and this was held to be error.

Richardson was not placed in either a higher or lower grade of employment by temporarily taking over the firing of the boiler during the day. His grade was not raised to that of Ruffin because concededly he was incapable of filling Ruffin's place. His grade was not lowered because he had regularly fired the boiler each morning until Ruffin arrived to take it over. His status continued to be that of a utility man. In such cases the computation should not be based upon the particular work the employee was engaged in at the time of his injuries, but it should be based upon the work he was engaged in most of the time, or the work that he was principally or chiefly engaged in. [Ropp v. Moon Bros. Mfg. Co., 226 Mo. App. 845, 44 S. W. (2d) 888.]

If on August 25, 1941, Richardson had been permanently relieved of all of his duties except that of firing the boiler, and placed on full time as a fireman of the boiler regularly and permanently, there would be some justification for the contention that his grade of employment had been changed. Such is the reasoning of the Supreme Court in the case of Sayles v. Kansas City Structural Steel Co., 344 Mo. 756, 128 S. W. (2d) 1046, where it is said of the employee in that

case, "there is every reason to believe that his employment would have continued, not only through the then current year but thereafter." And further, "Be this as it may the evidence justified the conclusion that there was a change made in June; 1934, not only in the character of Sayles' employment *as to regularity and permanency and the manner of pay, but also, to some extent at least, in the nature of his duties.*" (Italics ours.) No such reasoning can be applied to the undisputed facts as to Richardson's employment. Rather than regularity and permanency as to his continuing to fire the boiler throughout the day, it was distinctly understood that he was not to do so regularly and permanently, but only for the one week because of Ruffin's sprained back. And in fact when the injury occurred the week had passed, and Richardson had returned to his duties as a utility man (if he had ever left such duties), and then intended to fire the boiler only until Ruffin arrived and then quit for the day, as he had been doing all along.

It is contended by respondent that in the notice of the accident given by the employer to the Workmen's Compensation Commission the employee was designated as "fireman" at the time of the accident. Be that as it may, it would have little or no significance in view of the fact that all of the circumstances surrounding Richardson's employment during the year preceding the accident were in evidence, and conclusively show that Richardson was a utility employee and not just a fireman. [Sayles v. Kansas City Structural Steel Co., 344 Mo. 756, 128 S. W. (2d) 1046-1053.]

There is a total lack of evidence to justify the basis of computation adopted by the Commission, and the judgment of the circuit court must be reversed and the cause remanded to the circuit court with directions to reverse the award and remand the cause to the Workmen's Compensation Commission. It is so ordered. *McCullen* and *Anderson, JJ.,* concur.