Francis X. Greenan v. Emerson Electric Manufacturing Company, Appellant.—No. 39499.—191 S. W. (2d) 646.

Division One, December 3, 1945.

Rehearing Denied, January 7, 1946.

*Orville Richardson* and *Jones, Hocker, Gladney & Grand* for appellant.

*Mark D. Eagleton* and *Wm. H. Allen* for respondent.

790

BRADLEY, C.—Action for damages for personal injury. The jury found for plaintiff and assessed his damages at $12,000. A remittitur of $3,000 was made; motion for a new trial overruled and defendant appealed.

Defendant manufactured fighter plane turrets at its plant in St. Louis, and plaintiff was an employee in the plant. April 3, 1944, while lowering a turret, with a hoist, into what is termed a rolling fixture, one side of the turret dropped down and caught plaintiff's hand. Small horseshoe like lugs attached to cables pending from the hoist, fitted over the eye of the eyebolts which were permanently attached to the turret near its top. When properly hooked up, what we may term a safety bolt passed through the flat sides of the lugs and through the eye of the eyebolts, and a nut was then screwed on the end of the safety bolt. If so hooked up a lug could not become detached from the eyebolt on the turret, and the turret could not drop down as it did when plaintiff's hand was injured. As we understand,

there were 3 cables, 3 lugs, and 3 eyebolts. Two of the eyebolts were perpendicular; one was horizontal. The turret dropped down because the employee who hooked up the hoist cable to the turret failed to insert the safety bolt through the eye of the horizontal eyebolt, but passed the safety bolt under the eye of the eyebolt. Such a hookup could not have been made to the perpendicular eyebolts.

The rolling fixture into which plaintiff was lowering the turret was cylindrical in form, and about 4 feet in height and about 3½ feet in diameter. The turret was also cylindrical in form and about 4 feet in height, and had a diameter only slightly less than the diameter of the rolling fixture. In order to steady the turret down into the rolling fixture plaintiff placed his hand under the ring gear of the descending turret and above the top of the rolling fixture. The defectively hooked up lug on the horizontal eyebolt slipped over the head of the eyebolt and the turret dropped down on plaintiff's hand.

Plaintiff alleged (1) failure to exercise ordinary care to furnish reasonably safe tools and devices with which to work; (2) negligent failure to properly fasten or secure the turret, which negligence, it is alleged, made plaintiff's place of work unsafe; and (3) negligent failure to warn plaintiff that the turret was improperly fastened. The cause was submitted only on the second ground.

Defendant's answer was (1) a general denial; (2) that plaintiff's annual earnings did not exceed $3600, and for such reason, plaintiff's claim was exclusively within the jurisdiction of the Workmen's Compensation Commission; (3) assumption of risk; (4) contributory negligence; and (5) that plaintiff's injury was caused solely by the negligence of a fellow servant. The reply was a general denial.

Defendant assigns error (1) on overruling its motion for a directed verdict at the close of the whole case; (2) on the giving and the refusal of instructions; (3) on the refusal to declare a mistrial because of an alleged prejudicial statement by plaintiff's counsel in the opening statement to the jury; and (4) on an alleged excessive verdict.

The assignment on overruling the motion for a directed verdict is based on the contentions (1) that plaintiff's annual earnings did not exceed $3600; (2) that plaintiff assumed the risk; (3) that plaintiff's injury was caused solely by the negligence of a fellow servant; and (4) that plaintiff was guilty of contributory negligence as a matter of law.

Plaintiff became an employee of defendant January 12, 1942; commenced work as a junior assembler and received, in the beginning, 75 cents an hour and this was soon raised to 85 cents per hour. April 12, 1942, he became a senior assembler and received 95 cents an hour. A junior and senior assembler assembled the electrical parts of the turrets. September 12, 1942, plaintiff became a probationary leadman and received $1.05 an hour, and on November 30, 1942, he became a leadman in the senior assembly department and

received $1.10 an hour. February 28, 1944, he was transferred to the final assembly department, but remained a leadman and continued to receive the same pay—$1.10 an hour. A leadman instructed new men who came in; got instructions from the foreman and passed these instructions on to other employees; saw to the quantity of work gotten out, as well as the quality of the work.

Plaintiff, in 1943, did considerable overtime and Sunday work, and his earnings in 1943 were $4,029.23. His earnings from February 28, 1944, when he was transferred to the final assembly department, to April 3, 1944, date of injury, averaged about as in 1943. Defendant contends that when plaintiff was transferred from the senior assembly department to the final assembly department his *grade* of employment changed, and that his average *annual* earnings could not be determined by what he earned in 1943, and from January 1, 1944, to February 28, 1944, when he was transferred. Defendant says that the *grade* of employment is not to be determined by the *title* which an employee may hold or his *rate* of pay, but by the *character* of work being done when injured, and defendant says that when plaintiff was transferred to the final assembly department there was a change of grade of employment, and that only the earnings after the transfer may be considered in determining the annual earnings. As stated, plaintiff was transferred February 28, 1944, and was injured April 3, 1944, hence, he had not been in the final assembly department a sufficient time to have there a *record* of annual earnings. Such being so, defendant says that plaintiff's annual earnings must be determined by a consideration of Sec. 3695, and subsections (a), (b), (c), and (d) of Sec. 3710, R. S. 1939, workmen's compensation law, and that plaintiff's annual earnings in the situation should be determined under subsection (c) or (d).

Sec. 3695 provides, among other things, that the word *employee* "shall not include persons whose average annual earnings exceed three thousand six hundred dollars." Sec. 3710, R. S. 1939, provides that "the basis for computing the compensation provided for in this chapter shall be as follows:

"(a) The compensation shall be computed on the basis of the annual earnings which the injured person received as salary, wages, or earnings if in the employment of the same employer continuously during the year next preceding the injury.

"(b) Employment by the same employer shall be taken to mean employment by the same employer *in the grade* in which the employee was employed at the time of the accident uninterrupted by absence from work due to illness or any other unavoidable cause (italics ours).

"(c) If the injured person has not been engaged in the employment of the same employer for the full year immediately preceding the accident, the compensation shall be computed according to the annual earnings which persons of the same class in the same employment and

same location (or if that be impracticable, of neighboring employments of the same kind) have earned during such period.

"(d) As to employees in employments in which it is the custom to operate throughout the working days of the year, the annual earnings, if not otherwise determinable, shall be regarded as 300 times the average daily earnings in such computation."

In the cross-examination of plaintiff is the following: "Q. The work that you were doing over there (final assembly department), of course, was entirely different, an entirely different kind than what you had been doing in the electrical sub-assembly, was it not? A. Yes, sir. Q. And then it required a lot more judgment and skill, did it not, a more capable man, in the final assembly? A. No, sir. Q. Well, I mean by that, instead of working on a minor shop line, or a minor shop line where you would just have to add a part or tighten a bolt, you had to use a lot of judgment to determine whether or not this turret in its final and completed stage was fit for the Army, didn't you? A. Had to use a lot of judgment, but not more than I had to use previously. Q. Not more, that is a question of relativity, but you were applying your skill and knowledge to the final assembling of a great big turret which would function as a whole, did you not? A. Yes, sir. Q. Whereas, over in the electrical sub-assembly you were working on a particular bit of machinery for a slip ring or hanger assembly, were you not? Is that right? A. Not exactly, sir. That is quite an assemby; that is not a little bit of an assembly."

The term *grade* in subsection (b) of Sec. 3710, supra, is used to denote the relative position, rank or standing of an employee. Mossman v. Chicago & Southern Air Lines et al., 236 Mo. App. 282, 153 S. W. (2d) 799. In the Mossman case the deceased employee had been employed as a first pilot, but a few months prior to his death he was demoted to a reserve pilot in which position he worked both as first pilot and copilot and for less wages than he received when he held the position of first pilot. It was held that the change of position was a reduction in rank, a change of *grade*. The court said [153 S. W. (2d) 1. c. 801]: "The position of reserve pilot was one of less dignity than that of first pilot. While acting as such (reserve pilot) in relieving a copilot, he was subordinate to and subject to the orders of the first pilot."

After transfer to the final assembly department, plaintiff, as stated, continued to be a leadman, and continued to receive the same pay. There was no *demotion* and no *promotion*. No more skill or judgment was required in the new work than in the old. The work was still *assembly* work. Defendant cites the Mossman case, supra; Lamkins v. Copper-Clad Malleable Range Corp. (Mo. App.), 42 S. W. (2d) 941; Burgstrand v. Crowe Coal Co., 333 Mo. 43, 62 S. W. (2d) 406, and others, which we have examined. These cases do not support de-

fendant's contention. We rule that plaintiff's *grade* of employment was not so changed as to require his annual earnings to be determined under subsections (c) or (d) of Sec. 3710. See Sayles v. Kansas City Structural Steel Co. et al., 344 Mo. 756, 128 S. W. (2d) 1046, l. c. 1053; Richardson v. Consolidated Products Co. et al. (Mo. App.), 183 S. W. (2d) 393, l. c. 395; Buckley v. Elmira Coal Co. (Mo. App.), 104 S. W. (2d) 724.

■ Defendant, in the brief, says that the negligence of Wurtz "arose in the performance of a mere operative detail of the work, constituted a breach of his personal duty to plaintiff, was a risk assumed by plaintiff", and defendant says that the evidence conclusively shows that plaintiff "was injured solely as a result of the negligence of a fellow servant in improperly attaching the hoist to the turret."

When it was ascertained that the turret involved would have to have further work upon it, and would have to be removed from the stationary fixture to the rolling fixture, so it could be moved, plaintiff notified foreman Bilbe, and Bilbe said that there was nothing to do "but have it taken out" of the stationary fixture. Plaintiff said he then "told those members of my group that were around there just in a general way, that it would have to be removed." Only LeGan, Pokorney and Wurtz were there, and LeGan and Pokorney were busy so Wurtz hooked up the hoist to the turret. Plaintiff was not foreman. He merely told those of his group what the foreman said do, and then plaintiff went away and was not present when Wurtz made the hookup. Wurtz was also a leadman and had been for about a year and four months prior to plaintiff's injury, and at the time, was also trouble shooter. On the question as to plaintiff's duty to instruct Wurtz how to do his work, Wurtz testified: "Q. Was it part of his (plaintiff's) duty to instruct you and show you how to do the work and help you in it? A. Well, in my particular case I would say no, because trouble shooting involved finding the trouble yourself. In other words, trouble shooting is not a production element. Q. But in operating a turret or anything like that, hoisting device, would that be part of his duty as leadman? A. It would be part of his duties to instruct." But Wurtz does not say that it was plaintiff's duty to instruct him how to hook up the hoist. It was the duty of all leadmen, including Wurtz, to instruct new men. Plaintiff testified that his foreman told him that Wurtz "needed no instructions", and Wurtz testified that he knew how to hook up the hoist and needed no instructions. Under these facts there is no merit in the contention that in making the bad hookup ■ Wurtz's only offense was a breach of a personal duty owed plaintiff. Neither is there merit in the claim that plaintiff assumed the risk, and defendant does not stress that point.

It is conceded that Wurtz was plaintiff's fellow servant, except in respect to the act of making the bad hookup. In the absence of a

statute to the contrary, or of an express contract, a master is not liable to one servant for the negligence of another where both the injured servant and the negligent servant are engaged in the same common employment. 39 C. J., p. 537, Sec. 644; 35 Am. Jur., p. 760, Sec. 334; Parker v. Nelson Grain & Milling Co., 330 Mo. 95, 48 S. W. (2d) 906; Cain v. Humes-Deal Co., 329 Mo. 1107, 49 S. W. (2d) 90; Kelso v. W. A. Ross Construction Co., 337 Mo. 202, 85 S. W. (2d) 527.

Where injury to one servant is caused by the negligent act of another, the test, to be applied in determining whether the master is liable for failing to exercise ordinary care to furnish a reasonably safe place in which to work, is: Did the negligent act have a direct relation to the place of work?, or was it merely incidental to the work itself? If the instrument negligently used by the servant is a constituent element of and a physical part of the place in which the servant is required to work, then the negligent act of the servant is the negligence of the master. Johnson v. Corn Products Refining Co., 319 Mo. 958, 6 S. W. (2d) 568; Wall v. Rohan Boat, Boiler & Tank Co., 333 Mo. 619, 62 S. W. (2d) 764.

In the brief plaintiff says this: "And since the duty to exercise ordinary care to have the lifting device securely fastened to the turret by means of the horizontal eyebolt while the turret was suspended over the fixture at which plaintiff was required to work was a nondelegable duty of defendant relating to the safety of plaintiff's place of work, the employee who, on the occasion in question, undertook to fasten the lifting device to the turret by means of the horizontal eyebolt was not, with respect to the performance of that task, a fellow servant of plaintiff." To support such contention these cases are cited: Bender v. Kroger Gro. & Baking Co., 310 Mo. 488, 276 S. W. 405; Koerner v. St. Louis Car Co., 209 Mo. 141, 107 S. W. 481; Gimmarro v. Kansas City, 342 Mo. 428, 116 S. W. (2d) 11; Prapuolenis v. Goebel Construction Co., 279 Mo. 358, 213 S. W. 792; Adair v. Kansas City Terminal Ry. Co. et al., 282 Mo. 133, 220 S. W. 920; Combs v. Roundtree Construction Co., 205 Mo. 367, 104 S. W. 77. See also, the Johnson, the Wall cases, supra.

In the Bender case the plaintiff was a bread truck driver's helper. He was directed by the foreman of the loading platform to enter the trailer and remove empty bread trays. The same foreman directed the truck driver to detach the tractor from the trailer. There was a leg on the trailer and it was necessary to let this leg down to support the front end of the trailer before the detachment was made, but the driver made the detachment without letting down the leg. The plaintiff was in the trailer and did not know the detachment was being made. When the detachment was made in such negligent manner the trailer tipped over and the plaintiff was injured. It was held that although the plaintiff and the driver were ordinarily fellow

servants the negligent act of the driver affected the safety of the place of plaintiff's work and that the defendant was liable.

As to the other cases cited and relied on by plaintiff, some are similar in principle to the Bender case. All deal with the subject of master and servant and place to work. In the Koerner case, in banc, it is held [209 Mo. l. c. 154] that the fellow servant rule should be applied only in those cases where the injured servant and the negligent servant "are so associated and related in the performance of their work that they can observe and influence each other's conduct, and report any delinquency to a correcting power." In the present case, the bad hookup was made in plaintiff's absence and was, in effect, made on the order of foreman Bilbe, relayed by plaintiff. A lug, an eyebolt, a safety bolt, and a nut, like or similar to those with which Wurtz made the negligent hookup, were left with the clerk here, and it is quite apparent that if the space in the lug above the head of the eyebolt were plugged or made solid with the lug sides, such a hookup as Wurtz made could not happen. A lug for the horizontal eyebolt, unplugged or not made solid, as stated, might easily be hooked up as Wurtz hooked this one up. Any turret found defective, as this one was, would have to be lifted from the stationary fixture to the rolling fixture, and this lug was, we think, a constituent element of and a physical part of plaintiff's place of work, ■ hence we rule that the negligence of Wurtz in making the bad hookup was the negligence of defendant and a breach of its duty to exercise ordinary care to furnish a reasonably safe place in which to work.

■ Was plaintiff guilty of contributory negligence as a matter of law? Defendant contends that had plaintiff looked he could have seen that the safety bolt did not pass through the eye of the eyebolt and that had he looked he would have known that it was dangerous to place his hand under the ring gear of the turret, and above the top of the rolling fixture, and that he should not have stood in front of the turret while lowering it into the rolling fixture. As stated, plaintiff was not present when the hookup was made. When plaintiff returned the turret was suspended above the stationary fixture. In order to get the turret into the rolling fixture it was necessary to move it, with the hoist, across the aisle. The stationary fixture and the turret were each about 4 feet in height, and the bad hookup on the horizontal eyebolt was at or near the top of the turret. Plaintiff was 5 feet, 8 inches in height.

So it appears that the bad hookup was nearly 3 feet above plaintiff's head. Besides this, the lug, the safety bolt and the eyebolt were small objects. The lug opening between the sides was one inch from bottom to top, and the distance between the two sides of the lug was 3/8″. The eyebolt was 3/16″ in diameter, and was 7/8″ in length to its head, and its flat head, with eye in center, was 3/8″ in length.

The safety bolt was 1½″ in length and small enough to pass through the 3/8″ holes in the lug sides and the 3/8″ eye of the eyebolt. Plaintiff said that with the turret suspended as it was, it was impossible to see that the safety bolt was not through the eye of the eyebolt. And on cross-examination he was asked about safer places to have placed his hand to *steady* the turret into the rolling fixture. "Q. So, there would not have been a thing in the world to keep you from moving that (turret) with your hand under that ring of steel, would there? A. Only it would have been rather awkward to bend down that low and reach up so high with my other hand to operate the hoist. Q. Then, you could have gotten the part of the hoist above the ring gear, couldn't you? You could have moved it above the ring gear and your hand would never have been in the way there, would it? A. If I had moved it above the ring gear. I don't think I could have balanced it to get it down into that fixture."

And as to why he was in front of the turret instead of behind it, plaintiff testified: "Q. As a matter of fact, at the front part of the turret there is nothing but this big sheet of steel, that is, the armor plate on the outside surface? A. There are two protruding pieces of metal. Q. But in the back of the turret there are a lot of expensive and very delicate electrical conduits and oxygen lines and everything else that you have got to be careful not to smash in there and that is where you should have been? A. I was there until they got those conduits through, then it sagged on the front and I had to go around and get it there." We think the question of plaintiff's contributory negligence was for the jury. See Rose v. Mo. Dist. Telegraph Co., 328 Mo. 1009, 43 S. W. (2d) 562, l. c. 569; Goslin v. Kurn et al., 351 Mo. 395, 173 S. W. (2d) 79, l. c. 84, and cases there cited.

Defendant's assignment on plaintiff's instruction No. 1, and on the refusal of instructions A and I were, in effect, ruled in ruling the assignment on the refusal of the motion for a directed verdict. Refused instruction E was on the question as to whether defendant should have anticipated the negligence of Wurtz. The facts are not such as to warrant such an instruction. Scheibe v. Fruin-Colnon Contracting Co., 324 Mo. 375, 23 S. W. (2d) 44. There was no evidence upon which to base refused instruction F.

In the opening statement plaintiff's counsel said that defendant "should have fixed this thing"; that it was "very simple to fix; all they had to do was plug this opening up." Then counsel said, "As soon as they came and got it off the plaintiff's hand, they immediately started fixing the device and fixed it within an hour." Objection was made as to what was done after plaintiff was injured. The objection was sustained and the jury instructed to disregard the statement as to what was done after the injury. Then defendant moved for a mistrial, which was refused. We do not think error was committed in refusing a mistrial. Cordray v. City of Brookfield (Mo. Sup.), 88

S. W. (2d) 161, 1. c. ■■■ 165; Burow v. Red Line Service, 343 Mo. 605, 122 S. W. (2d) 919, 1. c. 921.

■ Is the $9,000 judgment excessive? Dr. F. G. Pernoud, plaintiff's witness, testified: "I first saw Mr. Greenan July 12, 1944; have seen him only four times; the last time was January 15, 1945 (a week before the trial). The middle knuckle of his right index finger is fixed in a flexed position at a right angle; there is no active motion at all; he cannot bend this joint at all; but I am able to take hold of the finger and bend it approximately 50% of the normal amount of latitude of motion. He is not able to bring the right middle finger down against the palm; it stays approximately an inch from the palm. The right thumb is enlarged about one-fifth, particularly the middle knuckle joint. The thumb has about one-third of normal motion. The ligament over his wrist has been so torn that at one point when he extends his wrist the leaders stand out. There is an excess of scar tissue and thickness and piling up of tissue on the palm side of the basal joint of this index finger, and there is an apparent bone thickness due to a sliver of bone at this particular point which causes a thickness over the front of the palm side of the basal joint of the right index finger. There is an irregular discolored scar, two inches long, on the back of his right hand, and there is a small scar over the back of the hand at the base of the index finger. I would say he has lost 50% of the use of his hand."

Dr. Kurtz, a company doctor, treated plaintiff immediately after injury. Also, Dr. Key treated plaintiff, and shortly prior to the trial, Dr. Key, at defendant's request, examined plaintiff's hand, but neither of these doctors testified. An operation was performed on plaintiff's hand while being treated by Dr. Key. He was in the hospital four days. About three weeks after injury plaintiff went back to work as leadman for defendant; found that he could not use his hand to do the work expected of him and remained only about two months. Then plaintiff went to Mt. Olive, Illinois, for about four months; did "a little electrical work there", and earned about $500; went to work for the Curtiss-Wright Company October 17, 1944, using a small hand drill. At the time of the trial plaintiff was still employed by the Curtiss-Wright Company, and was earning $46 per week.

At the end of a day's work plaintiff's hand is "pretty sore from the wrist on down; my arm feels a little bit tired because I use the ball of my hand mostly because I cannot use these first three fingers, and my hand and whole arm is a little bit tired and my fingers particularly are very sore and I usually bathe them (every night) with hot water and put some ointment on that was recommended to me by my doctor. My index finger pains constantly, but sometimes the pain is lighter. It is very sensitive, but I can go outside and as soon as I got out in the air it gets very sore at the base. My thumb,

as the day progresses, gets pretty sore and this enlarged joint becomes more enlarged and sometimes gets inflamed.''

Plaintiff, when injured, was 37 years old; his expectancy was 30.35 years. He was a graduate of high school and had three years college work. At time of injury, he was earning $72.50 per week, not counting overtime or Sunday work, as we understand. As stated, at the time of trial, he was earning $46 per week. Defendant reminds that there is no evidence that reduction in earnings is due to the injury. It is true that there is no direct evidence, but we think that such is a fair inference. The reduction in earnings amounted to $1378 per year. When injuries are similar, there should be a reasonable uniformity of verdicts. Goslin v. Kurn et al., 351 Mo. 395, 173 S. W. (2d) 79, l. c. 89, and cases there cited. In Mahmet v. American Radiator Co. (Mo. Sup.), 294 S. W. 1014, the injury was to the right hand and more severe than in the present case; the plaintiff's earnings were $31 per week; age not given. A verdict already reduced from $15,000 to $10,000, was further reduced to $7500. In Jones v. Thompson, 353 Mo. 730, 184 S. W. (2d) 407, the injury was to the left hand, about 90% loss of use; the plaintiff was 41 years old; had earned as much as $75 per week and as low as $30. The verdict for $18,521 was reduced to $12,521. In the Jones case, several cases are reviewed as to amount of verdicts, and we make reference to this review. See also, Jenkins v. Mo. State Life Ins. Co., 324 Mo. 941, 69 S. W. (2d) 666. Quite a few cases dealing with the amount of verdicts are cited in the Jenkins case, and we make reference to these.

''We are usually reluctant to order a further reduction after the trial court has considered and passed upon the matter and once substantially reduced the amount.'' Gieseking v. Litchfield & Madison Ry. Co., 344 Mo. 672, 127 S. W. (2d) 700, l. c. 708. All things considered, including the present value of the dollar, we do not think the verdict should be further reduced.

The judgment should be affirmed, and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.